## Kirk v. Commonwealth.

(Decided October 11, 1921.)

### Appeal from Edmonson Circuit Court.

1. Criminal Law—Submission to Jury.—It is a well known rule that if there is any evidence conducing to prove the defendant's guilt of the crime charged, or any degree thereof, a peremptory instruction should be refused and the case allowed to go to the jury.

2. Criminal Law—Circumstantial Evidence.—Equally familiar is the rule that a conviction may be had in a criminal case, whether for murder or a lesser crime, upon circumstantial evidence alone.

3. Criminal Law—Continuance.—The refusal of a continuance to the defendant in a criminal case on account of the absence of witnesses is not reversible error, where it is apparent from his affidavit therefor that their testimony would be merely cumulative, and it did not appear from the affidavit that their absence was not without his procurement.

4. Homicide—When Murder Shown—Instructions.—Where on the trial of one accused of murder the facts and circumstances established by the evidence are so convincing as to preclude any other theory of the homicide than that of murder, the refusal by

the trial court of instructions on manslaughter and self defense is not reversible error.

MILTON CLARK for appellant.

CHAS. I. DAWSON, Attorney General, THOS. B. McGREGOR, Assistant Attorney General, and J. H. GILLIAM, Commonwealth's Attorney, for appellee.

OPINION OF THE COURT BY JUDGE SETTLE—Affirming.

The appellant, Herman Kirk, was tried in the court below under an indictment charging him with the crime of . murder; the jury returned a verdict finding him guilty as charged and fixing his punishment at · confinement in the penitentiary for life. He was refused a new trial and prosecutes an appeal from the judgment of conviction entered upon the verdict.

The victim of the homicide was an old man, apparently of the "hobo" class, wholly unknown to any resident of the community in which he was killed. Although called in the indictment John Doe, it is therein declared that was not his correct name, which was to the grand jury unknown. According to the facts furnished by the bill of evidence he first appeared Saturday, February 12, 1921 shortly after twelve o'clock, noon, at Rocky Hill Station, a village on the Louisville & Nashville railroad, eighteen miles north of Bowling Green and five and a half miles south of Glasgow Junction, another village on the railroad. He was then walking on the railroad track or in a path on the railroad right of way beside it, in the direction of the latter place. On the afternoon of the following day, Sunday, February 13, his dead body was found behind a log about 100 feet from the railroad track in a flat place or sink filled with bushes, half the distance between Rocky Hill Station and Glasgow Junction. His face was badly mangled and his skull crushed to a pulp, evidently inflicted by terrific blows with some blunt and deadly instrument or instruments, wielded by a powerful and merciless hand with intent to kill, and which produced death almost instantly. The pockets of his clothing were exposed with the inside of each of them turned outward and neither purse, money nor other thing of value found on his person. He evidently was killed on the railroad track, or in the path beside it, 100 feet from where his body was found. This was demonstrated by the presence of

bloodstains in the path beside the railroad track at that distance from the body and on the ground toward where it was removed; also, by the presence in the soft soil of the path of the tracks of two men, a few of which were made by heavy "hobnail" shoes such as, numerous witnesses testified, were worn by the deceased as he passed through Rocky Hill Station the day of the homicide and were found on his feet after his death. The greater number of the tracks, however, were made by rubber overshoes such as were worn by appellant when arrested for the crime and, according to several witnesses, worn by him the day of the homicide. Measurements of the tracks made upon their discovery, when applied to the shoes on the feet of the deceased and the overshoes of appellant, showed a few of them of such size and character as were or could have been made by the shoes of the deceased, but the greater number of them were of such size and character as were or could have been made by the overshoes of the appellant. The body of the deceased evidently was dragged by the feet and with his back to the ground from the place of the bloodstains in the path beside the railroad track to the sink where it was found. This is demonstrated by the facts as shown by the evidence, that no tracks were found leading from the bloodstains in the path to the point where the body was found that could have been made by the shoes worn by the deceased, but there were tracks leading from the bloodstains in the path to where the dead body lay, made by overshoes of the size and character of those worn by appellant, which tracks were made by the backward stepping of the wearer of the overshoes in dragging the body of his victim, the dragging of the body being further shown by the flattened or mashed condition of the grass and weeds on the ground over which it passed, the turning of the clothing the wrong way and causing it to gather under the upper part of the back and head. When the body was discovered the face was covered by the overcoat of the deceased, which had been pulled over his head for that purpose. The overcoat was rendered immovable by the placing on it of a large rock which had been removed from its well-defined bed only a few feet away. Just off the right of way of the railroad company and near the bloodstains in the path beside the railroad track were found a heavy sassafras stick and rock, either of sufficient size and weight, if used in inflicting blows, to have produced the wounds causing the deceased's death,

and each containing bloodstains. The stick had the appearance of having been freshly broken from its parent tree or bush, and by investigation on the part of the several persons a sassafras sapling, found near the railroad track at considerable distance from the body of the deceased, showed the loss of a freshly broken large limb, and upon comparing with the break in the tree the broken end of the sassafras limb or club found at the place of the homicide, it was identified as the limb broken from the tree.

Other than the man and his slayer, there were no eye-witnesses of the homicide, but in addition to the facts and circumstances above related, evidencing the killing and that it was murder, the following facts, also furnished by the evidence, were relied on by the Commonwealth to connect appellant with the crime and prove its commission by him. These facts, in brief, were that a negro man, later identified by witnesses as appellant, arrived at Rocky Hill station Saturday afternoon, February 12, 1921, from the direction of Glasgow Junction on a freight train which got there at 12:30 or 1:00 o'clock p. m., and immediately after deceased left Rocky Hill Station walking toward Glasgow Junction. The freight train passed the deceased just before or upon reaching Rocky Hill Station, and without stopping at that place greatly diminished its speed in approaching and passing it. Appellant was seen by the witnesses Bush and son to get off the train at the Bush crossing near the edge of the village and a little later by Rigsby and Johnson near Hudson's store in the village. He was then dressed, as stated by the witnesses, in yellow or brown overalls, overshoes and a fur cap. When arrested he was dressed as thus described and admitted that the same apparel was worn by him the day the homicide occurred. Upon quitting the train appellant started southward as if to enter the village of Rocky Hill Station, but in a few minutes returned to the Bush crossing, then proceeded, walking on or beside the railroad track, toward Glasgow Junction, thereby retracing the route over which he had just come by the freight train. At that time the deceased was still in view walking upon or beside the railroad track toward Glasgow Junction. When he and appellant were last seen by the witnesses near Rocky Hill Station, appellant, who walked faster than deceased, seemed to have gotten in about thirty yards of him.

Another witness besides those at or near the Bush crossing, Eugene Madison, claimed to have seen both the deceased and appellant after they left the crossing. Madison's home is between Glasgow Junction and Rocky Hill Station, about one and a half mile from the latter place, which he visited in the afternoon of Saturday, February 12, 1921, walking from his residence across his farm to the L. & N. railroad track, thence down the track to Rocky Hill Station. According to his testimony he reached the railroad track at a point 300 or 400 yards above the Bush crossing and before getting upon the railroad track he saw deceased at a distance of 60 or 65 feet, walking on the track, or path beside it, toward Glasgow Junction, but had no conversation with him. His description of him, however, was the same as that given by other witnesses. Madison next saw about thirty yards in the rear of deceased a negro man then unknown to him, but whom he later identified as the appellant. When the witness got to the negro man the latter was standing with one foot on a rail of the track rolling a cigarette. He requested of the witness a match, which was followed by a brief conversation between them respecting the tobacco crop in that vicinity, the market price of which he asked. During the conversation the witness stood near and immediately facing the negro and had, as he testified, a good opportunity to observe, and did observe, his face, dress and the quality of his voice. This witness, as did others by whom the negro was described, declared that he was a much younger, larger and heavier man than the deceased; that he wore, outwardly and in addition to whatever underclothing he may have had on, brown overalls, rubber overshoes and fur cap. When the conversation ended the witness proceeded on his way to Rocky Hill Station, without looking back to see what became of the negro or deceased. On Monday afternoon, two days later and following the arrest of appellant charged with the murder of deceased, the witness, Madison, was called to Glasgow Junction to inspect him and ascertain whether he was the negro man whom he met and talked with on the railroad track near Rocky Hill Station the previous Saturday, and upon seeing appellant in the custody of the arresting officer he positively identified him as the same man he met on Saturday at the time and place indicated, the identification tion being made by means of his features, figure, voice,

and, also, by the brown overalls, rubber overshoes and fur cap he was then wearing, which the witness declared to be the same he wore at the time of his meeting him the previous Saturday. Gibson, a witness, living near Rocky Hill Station, to which he walked from Glasgow Junction down the railroad track the afternoon of Saturday, February 12, testified that he left Glasgow Junction at 2:30 o'clock p. m., and between that time and three o'clock, a mile below the latter place, he saw a man approaching him, walking on the railroad track, from the direction of Rocky Hill Station, but at such a distance as prevented him from ascertaining his color or apparel, except that he wore a cap; this man left the railroad track and walked toward a traveled road leading to Glasgow Junction, which at that point ran parallel with the railroad and at a distance of a hundred or more yards from it.

Witnesses, Ivey Ray and T. T. Rowntree, the former residing two miles from Glasgow Junction on the turnpike leading therefrom to Rocky Hill Station, and the latter on the same road a mile from Glasgow Junction, testified that they together left Glasgow Junction, Saturday, February 12, at three o'clock p. m. in a buggy for Rocky Hill Station, and shortly after leaving Glasgow Junction they saw appellant walking toward them from the direction of Rocky Hill Station, but that just before reaching them he suddenly left the road in which they were driving, and taking another which led from it and also into Glasgow Junction, passed them at a greater distance than would have separated him from the buggy if he had continued in the road he left. Both Ray and Rowntree were well acquainted with appellant and he with them, and in passing both spoke to him, using the salutation customary among acquaintances. Only then did the appellant appear to take notice of them, as he returned the salutation, turning his face toward them for that purpose, when nearly past them. In passing him Ray and Rowntree noticed that he had on brown overalls and a fur cap. They did not observe his feet, but both saw that his clothing was black and muddy.

It appears from the bill of evidence that appellant's mother is a resident of Glasgow Junction, and that he and his wife were with her several weeks preceding the homicide, during which time he had no known employment. In testifying in his own behalf on the trial, he claimed to be a resident of Bowling Green and that he lived and

worked there or in that vicinity for six months, he and his wife occupying the greater part of that time rented rooms but he was unable to give the name of the owner of the rooms, or tell where or for whom he had worked. Although a young and vigorous man, like the stranger of whose death he was accused, appellant, according to the evidence, was without occupation or home. The evidence introduced by him under his plea of not guilty was in support of the *alibi* constituting his only defense. It was his claim that he was not at Rocky Hill Station the day of the homicide, but that he went by freight train early in the forenoon of February 12, from Glasgow Junction to Cave City, and returned, also in the forenoon, from that town to Glasgow Junction with and in the automobile of a man unknown to him, reaching Glasgow Junction about twelve o'clock; that he went at one p. m. to the stores of Jewel and James and did not leave Glasgow Junction again that afternoon. He admitted, however, that he voluntarily stated to officer Alexander and others, after his arrest, that after remaining in Glasgow Junction until 1 or 1:30 o'clock p. m., February 12, he went to Locust Grove nearby, and engaged in a game of craps with certain other negroes. One witness testified that he saw appellant at Cave City at 11 a. m., February 12, and two or three others, including his mother, that they saw him in Glasgow Junction about 1:30 p. m. that day.

Saying nothing of the lack of corroboration of many of the salient features of the appellant's own testimony, or the improbability of much of that of his witnesses, we can but remark that we have rarely found evidence as to the identity of an accused as strong as that furnished by five of the Commonwealth's witnesses, the two Bushes, Rigsby, Johnson and Madison, regarding the identity of appellant as the man seen at Rocky Hill Station February 12, and later following the victim of the homicide to the place where his life was taken. It is to be remarked, too, that these witnesses upon again seeing appellant after his arrest, without hesitation or doubt, declared him the person they had seen on the day of and prior to the homicide at the places and under the circumstances already stated, whom they were able to know by his voice, physical appearance and apparel, which was the same worn by appellant on the day of the homicide. Moreover, corroborative of this testimony of the witnesses named is that of the witnesses Ray and Rowntree, who met appellant near Glasgow Junction at, or shortly after, three o'clock p.

m., on the day of the homicide. It cannot, therefore, be denied that the evidence of these seven witnesses, together with the circumstances attending the homicide, not only shows that appellant had full opportunity to commit the homicide, but strongly conduced to prove that he alone is the guilty party and that the crime was murder.·

Obviously the evidence referred to gives no support to the contention of appellant's counsel, assigned as error requiring a reversal, that the trial court should have sustained his motion, made at the conclusion of the evidence, for an instruction peremptorily directing a verdict of acquittal. The evidence as a whole authorized the submission of the case to the jury. It is a well known rule that if there is any evidence, even though slight, which tends to prove the defendant's guilt of the crime charged or any degree thereof, a peremptory instruction should be refused and the case allowed to go to the jury. Gordon v. Commonwealth, 136 Ky. 508. Equally familiar is the rule that a conviction may be had in a criminal case, whether for murder or a lesser crime, upon circumstantial evidence alone. Indeed, such evidence has often been as convincing as that furnished by eye-witnesses to the commission of the crime. Wendling v. Commonwealth, 143 Ky. 587; Smith v. Commonwealth, 140 Ky. 599.

Yet another well recognized rule is that unless the verdict in a criminal case is flagrantly against or wholly unsupported by the evidence, it will not, on appeal, be disturbed. Polley v. Commonwealth, 171 Ky. 307; Allen v. Commonwealth, 176 Ky. 475. The reason supporting this rule is, that as it is peculiarly the province of the jury to pass upon the facts and determine whether the witnesses for the Commonwealth or defendant shall be believed, their verdict should carry great weight. Day v. Commonwealth, 163 Ky. 269. Appellant's complaint of the overruling of his demurrer to the indictment by the trial court is without substantial merit. The indictment fairly conforms to the requirements of the Criminal Code, section 122, subsection 2. Whatever defects appear in it are of form rather than of substance; though inartistically worded, it seems to omit no allegation of fact essential to constitute the crime of murder, as it in reasonably intelligible terms charges appellant with the murder, sufficiently describes the person killed, the acts or means by which it was accomplished and alleges the malice and felonious intent with which it was done. The law looks

less to form than to substance, and where an indictment states in unmistakable language all of the acts necessary to constitute the crime charged, it will be held sufficient. Green v. Commonwealth, 172 Ky. 397; Turner v. Commonwealth, 167 Ky. 365.

Appellant's contention that the refusal to him by the trial court of the continuance asked upon his affidavit was prejudicial error, is untenable. The grounds set forth in the affidavit mainly were the absence of two named witnesses and the inability of his counsel to prepare his case for trial. The matter of granting or refusing a continuance is largely in the discretion of the trial court, which, in the absence of abuse on the part of that court, will not be interfered with by the appellate court. It is true more latitude is exercised in granting a continuance at the appearance term than at a subsequent one. But in the case at bar we find no sound reason for holding the refusal of the continuance asked by appellant error. The testimony of the absent witnesses was as to appellant's *alibi* and would have been merely cumulative, as other witnesses used by him on the trial testified fully to the same facts claimed to be known to the absent ones; besides, the affidavit failed to state that the absent witnesses were not absent by appellant's procurement. It is also manifest that appellant's counsel had sufficient time to prepare for his trial. He by employment represented appellant at his examining trial, two weeks before the final trial and then, and before the final trial, had reasonable time to find witnesses and prepare his defense. In addition appellant had under the statute the right to introduce as evidence on the trial in the circuit court the affidavit regarding the testimony of the absent witnesses, subject to contradiction by the Commonwealth. This right could not be, and does not appear to have been, denied him by the court, though the record fails to show whether he availed himself of it. He does not, however, complain that he was not allowed the right and we will not, therefore, infer error on the part of the court regarding it.

Appellant complains that his rights were prejudiced by an instruction of the trial court, which referred to deceased as a white man, and insisted that it committed reversible error in refusing to instruct the jury on the law of voluntary manslaughter and self-defense.

The first contention is without merit, as the color of the deceased was material as a means of identifying him

as the unknown person charged in the indictment to have been killed. The second contention is equally lacking in merit, because all the facts and circumstances established by the evidence, such as the scarcity of tracks made by the deceased at the place of the killing, the greater number made by his assailant, the atrocious nature of his wounds, the dragging away and attempted concealment of the body and character of the weapons employed to do the killing, all conduced to prove that the killing was premeditated upon the part of the slayer, and when considered with the evidence of the rifling of deceased's pockets, indubitably shows the motive of the slayer was robbery and the killing murder, in view of all which and the proof connecting appellant with the crime, together with the insufficient proof of the *alibi* relied on by him, an instruction on manslaughter or self-defense was unauthorized.

The case comes within the rule announced in Bast v. Commonwealth, 124 Ky. 747, and later cases, viz.: that where the facts and circumstances in evidence are so convincing as to preclude any other theory of the homicide than that of murder, instructions on manslaughter or self-defense should not be given. We find in the record no incompetent evidence that could have prejudiced any substantial right of appellant; and while the remarks of the Commonwealth's attorney made to the jury in argument, complained of, were inflammatory and should not have been indulged in, they cannot be said to constitute reversible error.

As on the whole case no error justifying a reversal is apparent, the judgment is affirmed.