## Haynes v. Commonwealth.

.(Decided April 18, 1922.)

## Appeal from Pulaski Circuit Court.

1. Criminal Law—Evidence.—Evidence examined and held to be sufficient to support a verdict for manslaughter.
2. Criminal Law—Collateral Facts and Circumstances.—The direct evidence of witnesses present at a difficulty may be contradicted or discredited by collateral facts shown by the situation of the parties, the circumstances surrounding them, the location of the wounds, the nature and conformation of the ground and the character and temperament of the parties and the witnesses. Such facts, circumstances and conditions are frequently more convincing than the direct statements of men.

WM. & B. L. WADDLE for appellant.

CHAS. I. DAWSON, Attorney General, and THOMAS B. McGREGOR, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY TURNER, COMMISSIONER—. Affirming.

Appellant was indicted charged with the murder of I. N. Young by shooting him, and upon his trial was found guilty of manslaughter and his punishment fixed at confinement in the penitentiary for three years.

His motion for a new trial was overruled and he has appealed.

The only two grounds relied upon for reversal are, (1), that the court erred in its refusal to direct the jury to find the defendant not guilty at the close of the Commonwealth's evidence and at the close of the whole evidence, and, (2), because the verdict is palpably and flagrantly against the evidence and because the latter is insufficient to support the verdict.

The evidence is that all the parties to this controversy and all the witnesses lived in Pulaski county on Buck creek; that defendant is a young man twenty-five years of age and I. N. Young, the deceased, was fifty years of age at the time of his death; that in April, 1921, there was, at a certain point in Buck creek, and had been for some time, a fish trap and on the night in question about dusk the decedent Young and the witness Heath, a young man, went to the fish trap and on the bank of the

stream near it built a fire with the purpose of spending the night there and taking fish from the trap as they got in it; that shortly after Young and Heath reached the place appellant, accompanied by his brother Earl and Al Lowery, also reached the place and all of the parties spent the night at the place until two or three o'clock in the morning when the homicide in question occurred; that up to a short time before the shooting the parties had all gotten along nicely, were all in good humor and there had been no unpleasant occurrences.

It seems reasonably clear that the object of the two parties in going to the fish trap was the same, that is, to procure the fish that might be taken from the trap, and it appears that as the fish were taken from the trap they were placed in a sack and the sack was then placed in the water for the purpose of keeping the fish alive or preserving them.

Other than the decedent, the four were the only persons present, and upon the trial Heath was the only one of the four introduced for the Commonwealth. His testimony, in substance, is that about twelve o'clock on that night he had gone to sleep and some time later, he thinks about two or three o'clock in the morning, he was awakened by pistol shots and poked up the fire so as to give some light, but he saw nobody; that the first thing he did see in his search was the sack of fish which had been in the creek when he went to sleep, and upon going a few steps further he found lying on a rock the body of Young; that the powder smoke was awfully strong and that upon finding the body he went home and informed Mrs. Young and she, with some of the neighbors, immediately came back to the place; that it was a very rough place at the point where the fire was built and between that and the creek where the trap was, and the rocks were very large; that up to the time he had gone to sleep there was no quarrel or unpleasant occurrence between any of the parties; that the fish trap was his and Young's and that they had built it and that up to the time he went to sleep appellant and his party had demanded none of the fish, and that Lowery was the grandson of the deceased Young's wife; that there was a cap under the left shoulder of Young's body when he came back with Mrs. Young and that it was Bradley Haynes' cap and that they found near his body a flashlight.

The Commonwealth also introduced Misses Nellie and Fannie Haynes, two young ladies who are relatives of ap-

pellant although the precise kinship is not stated. These two young ladies state, in substance, that the afternoon before the shooting they met at or near the postoffice Bradley Haynes and Albert Lowery and overheard a conversation between them wherein Lowery said to Haynes, "Let's go to the fish trap," and Haynes said, "There is no use to go when that old contrary Bud Young is down there, that we would not get any fish if we went." Thereupon Lowery said, "We will have fish or we will have hell." In addition to this statement by each of them, one of them stated that Lowery said in the course of the conversation between him and Haynes that he did not have any cartridges and that Haynes said that he had plenty and would use them if he had to. This was, in substance, all of the evidence introduced by the Commonwealth except that certain witnesses stated the position of the body of Young, that it was lying on the left side, that a cap with some blood on it was under his left shoulder and that a rock about as big as two fists was near the body and had some blood on it. In addition to this it was shown by the Commonwealth that appellant had admitted that he fired the shots that killed Young.

The action of the trial court under these circumstances was proper; while the Commonwealth adduced no direct evidence showing the exact circumstances under which the killing occurred, it was shown that the defendant fired the shots, that the afternoon before in the conversation testified to by the two young ladies he and Lowery contemplated that if they went to the fish trap they might have trouble with Young; that they discussed how many cartridges they had and expressed the determination "to have fish or have hell," and these facts taken in connection with the fact that appellant did go to the fish trap armed, with no explanation why he should have done so, justified the court in submitting to the jury the question of the guilt or innocence of the defendant. The admission that appellant had fired the shots, together with the evidence that he looked forward to trouble with Young and the fact that he went armed and did have such trouble about the fish, which was the subject of the conversation the afternoon before, authorized the action of the court in overruling the motion for a directed verdict.

The evidence of the defendant and his brother Earl corroborates the evidence of Heath up to the time Heath went to sleep about midnight, and they state in addition that along about two or three o'clock in the morning ap-

pellant went out to the trap and that Young followed, that Young asked if he got any fish and he told him one; that Lowery and Earl Haynes came about that time and Young asked them what they were looking for, if they were looking for his fish, and appellant asked him what he had done with them and he said they were down in the creek; that Young went and got the fish and said: "Do you want to count them?" and further said, "There is no use in you fellows staying here thinking you can get any fish. I put that trap in and if any are caught they are mine." Thereupon appellant said that he did not know he had put the trap in, and then Lowery called him a "God-damned liar" and said to him, "If you want a trap go and put one in," whereupon appellant said that he thought it was against the law, and Young denied that it was against the law, and about that time Lowery said, "It is not against the law to tear one out," and Young then said, "There are three of you and one of me but you try it and see what becomes of you," and then appellant said, "These boys can do as they like, I do not want to tear it out;" that during this talk Young was trying to get to appellant and appellant told him to get on away and let him alone, that he did not want any trouble with him and that he was not going to tear the fish trap out and that Young then went away and set the fish down and said "Go on and tear it out," and that appellant told him "I am not going to tear it out," and that Young then said "I know you won't, you son-of-a-bitch," and ran at appellant and hit him in the head and shoved him back and then appellant began shooting and shot five times; that decedent got hold of appellant and was choking him, whereupon appellant hit him in the face with the revolver, and this is the substance of the testimony of ap-appellant and his brother Earl, except that appellant denied having the conversation with the two young ladies at or near the postoffice or at any place. Lowery was also introduced by the defendant and in addition to denying the conversation testified to by the two young ladies stated that he and appellant were at the postoffice the afternoon before and appellant asked him to go to the fish trap, and what kind of shape it was in, and suggested that they go and fix it up and his testimony up to the point where Heath went to sleep corroborates what Heath and the two Haynes brothers testified to. In addition he stated that he was deaf in one ear and did not hear all of the conversation leading up to the shooting,

but that he did hear Young say "Are you looking for the fish?" and Earl Haynes said "No," whereupon Young said, "I will show you the fish," and while he did not hear all the conversation he did hear someone say "son-of-a-bitch" and Young rushed on appellant; that he saw and heard two shots and it looked to him like the parties were three or four feet apart at the time and it was dark and he could not see whether Young had anything in his hand or not; while he denied the conversation testified to by the two young ladies he says that he saw the two Haynes young ladies at or near the postoffice and admits that he and Bradley Haynes about that time had a conversation with reference to going to the fish trap. The evidence further shows that defendant had a cut in his head and that the cap he had on was bloody and that the rock found near the body of Young also had blood on it.

The jury are the sole judges of the facts and the credibility of the witnesses and of the effect to be given to all the facts and circumstances in evidence. If they believed the evidence of the two young ladies with reference to the conversation of the afternoon before, which they were authorized to do, they had the right to assume that appellant expected a difficulty with Young when he went to the fish trap that night, and this, coupled with the admitted fact that he went there armed and that the difficulty did come up and that he did shoot and kill Young, authorized the inference to be drawn by the jury not only that appellant had malice against Young when he went to the fish trap and went there for the purpose of having a difficulty with him, but further justified the inference that the possession of the fish and the fish trap was not only the bone of contention between the parties, but that such controversy over the fish and the fish trap was contemplated and looked forward to in advance by the appellant.

Of course if the jury had accepted without reservation the testimony of defendant and his brother it would appear to be a case of self-defense, but the jury had the right to disregard any or all of the evidence and to draw fair conclusions from the other evidence in the case which discredited the evidence of the two Haynes brothers.

The evidence of the defendant and his brother to the effect that at the time Young attacked appellant the latter was disclaiming any intention of tearing out the fish trap appears to be inconsistent with their evidence that

Lowery was the only one who had made any statement which implied such a threat. If Young was going to attack any one who had threatened to tear out his fish trap he would naturally have attacked the only one who had made such threat.

Not only so, an analysis of the evidence of appellant and his brother and that of Lowery will show many discrepancies between them. Lowery says that Young did not use any oath during the conversation, and that while he heard the words "son-of-a-bitch" used he did not know who used them; he also says that when the first shot was fired the parties were only three or four feet apart while appellant and his brother said they were seven or eight feet apart and Lowery says nothing about any threat upon his part or of anyone else to tear out the fish trap.

Not only so, there is evidence that deceased had two pistol shots under or a little in the rear of his left arm and from that the jury might have inferred that the decedent's arms were raised above his head when he was shot, thereby indicating not only that he was not armed —which he was not—but further showing he was not assuming a belligerent attitude.

There were many facts and circumstances in evidence which might have been considered by the jury as contradictory of the evidence of the two Haynes brothers, and as appellant admitted the shooting, and as there was evidence that he expected the difficulty when he went to the fish trap, the evidence as a whole is deemed sufficient to support the verdict. The direct evidence of witnesses who are present at the time of a difficulty may be contradicted or discredited by collateral facts shown by the situation of the parties, the circumstances surrounding them, the location of the wounds, the nature and formation of the ground and the character and temperament of the parties and the witnesses. Such facts, circumstances and conditions are frequently much more convincing and carry much more weight with a jury or a court than the direct statements of men. Cloninger v. Commonwealth, 191 Ky. 841; Smith v. Commonwealth, 140 Ky. 559.

Judgment affirmed