## Swanigan v. Commonwealth.

(Decided October 16, 1931.)

ISHAM G. LEABOW for appellant.

J. W. CAMMACK, Attorney General, and GEORGE H. MITCHELL, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE BRATCHER—Affirming.

The appellant, Bill Swanigan, was indicted, tried, and convicted in the Bell circuit court for the murder of George Epps, known throughout this record as Honey Babe Epps, and his punishment fixed at ten years in the penitentiary.

As grounds for reversal it is argued: First, that the judgment of conviction was prematurely entered, in violation of section 283 of the Criminal Code of Practice; second, that at the time sentence was passed on this defendant the verdict and judgment of conviction had not been entered of record; third, that the verdict is not supported by the evidence; and fourth, the refusal of the court to admit competent evidence offered by the defendant.

Section 283 of the Criminal Code of Practice reads:

"Upon verdicts in cases of misdemeanor, and verdicts of acquittal in cases of felony, and upon trials by the court, and upon a plea of guilty, the court may immediately render judgment; but upon verdicts of conviction in cases of felony, the court shall not pronounce judgment until two days after the verdict is rendered, unless the court be about to adjourn for the term."

The court for Bell county is held at both Pineville and Middlesboro. The appellant was tried at the Middlesboro division of that court on March 11, 1931, and this verdict returned. The court adjourned in Middlesboro that day to reconvene at Pineville the following day. The appellant was conveyed to Pineville, and on March 12 was brought into court, · judgment pronounced, sentencing him to the penitentiary in conformity with the verdict of the jury. The attorney for the appellant was not present in the court at Pineville on the 12th at the time the judgment was pronounced. On March 13 the defendant, through his attorney, filed motion and ground for a new trial, which was overruled by the court.

The above section of the Code was construed by this court in the case of Hansford v. Commonwealth, 170 Ky. 700, 186 S. W. 498, 499. In that case the court said:

"The question raised by the second ground is that the trial court erroneously pronounced sen-

tence on the appellant on the day the verdict was returned. Section 283, Criminal Code, provides that upon verdicts of conviction in cases of felony the court shall not pronounce judgment until two days after the verdict is rendered, unless the court be about to adjourn for the term. It appears from the record here that sentence was passed upon the appellant before the filing of his motion and grounds for a new trial, and he had until the end of the term to file such motion and grounds. It also appears that the court was not about to adjourn for the term; indeed, that it did not do so for more than a week thereafter; consequently the action of the court in passing sentence upon appellant at the time indicated was contrary to the provisions of the section of the Code, supra. This error of the court would have compelled a reversal of the judgment if there had been objection made and exception taken thereto by the appellant at the time, but as this was not done, the error cannot be reviewed by us. Blanton v. Commonwealth, 147 Ky. 812, 146 S. W. 10; Thompson v. Commonwealth, 123 Ky. 302, 94 S. W. 654, 29 Ky. Law Rep. 705, 124 Am. St. Rep. 362; Buckles v. Commonwealth, 113 Ky. 795, 68 S. W. 1084, 24 Ky. Law Rep. 571.''

In the case of Miller v. Commonwealth, 231 Ky. 527, 21 S. W. (2d) 840, 845, the court held that pronouncing sentence on the day the verdict was rendered in a murder prosecution was not prejudicial, where motion for a new trial was overruled and adjournment was near, saying:

''In this case the motion and grounds for new trial had been overruled, and, nothing having been shown or intimated necessitating any further action in the case, delay in pronouncing judgment could have in no way been beneficial to appellant. The action of the court, if erroneous, was not prejudicial to his substantial rights.''

The appellant tendered and filed motion and ground for a new trial on the 13th day of March, which was overruled. It nowhere appears that the rights of the appellant were prejudiced by the act of the court in prematurely passing sentence on him, and a search of the record discloses no advantage that could have been obtained by the appellant by waiting one more day and passing sentence. The sentence was passed upon appel-

lant without objections, and, in view of the rule announced in the Hansford case to bring it to the attention of this court, objections and exceptions must have been made at the time. But, basing it on the broader view announced in the Miller case, the rights of the appellant were not prejudiced by this action nor was he deprived of any other ground by the acts of the court in passing judgment prematurely.

The second complaint is that the judgment of conviction had not been entered of record at the time sentence was passed upon the appellant. The bill of exceptions states that on Friday 13th the judgment had not then been entered on the order book or signed by the judge of the court, and that upon this day the circuit judge was called away on account of sickness of his son, and was not present to hold court or take orders on Saturday. The judgment of conviction and prayer for appeal was later written by the clerk and signed by the judge on March —, 1931; in the meantime this appellant had been taken to the reformatory at Frankfort. It is impossible to tell from this record just when the judgment was written on the order book of the Bell circuit court. The record before us shows that the verdict of the jury was returned March 11, 1931, and recorded in Order Book 20, upage 476. The order pronouncing judgment on defendant shows it was entered on March 12, 1931, on the same order book at page 480. On March 13 there was an order filing the appellant's motion and ground for a new trial and overruling same granting an appeal. The only thing that we have before us showing anything contrary to the record is the bill of exceptions, which says the order was not entered on Friday 13th, but was entered on March —, 1931. It is argued that it was reversible error for the judgment to be entered and signed after the term of court. We are cited to the case of Johnson v. Commonwealth, 80 Ky. 377; Rooney v. Commonwealth, 198 Ky. 515, 249 S. W. 763.

In the Rooney case it was held that the court was without jurisdiction to try the appellant because an order calling a special term of the court was made and entered after the expiration of the regular term, but was entered as last day's orders. This court held that, in view of the fact, the order calling the special term of the court was void; hence the court had no jurisdiction. In the Johnson case the judgment of conviction was not entered at the time the sentence was passed upon Johnson,

and he was unable to obtain a transcript of the record whereby he might perfect his appeal and only obtain that record on a rule issued against the clerk compelling him to file a copy of the judgment, which was done six months after the rule was issued. In that case the order was written by the clerk on the minute book and the minutes signed by the presiding judge of the court. The court says:

"Thus it will be seen that the minute-book did not contain the legal orders of the court, and the signature of the judge did not increase their validity; so that we have before us a verdict and judgment illegally entered and illegally executed, and their subsequent entry on the order-book by the clerk did not give them any validity before they were signed by the judge, if, indeed, the last day's proceedings now embracing the verdict and judgment and entered on the order-book have even been signed by him."

The court has said on a number of cases, it seems to be the rule that where, by inadvertence, oversight, or mistake, judgment on the verdict was not entered, the court had the undeniable authority to pronounce judgment on the verdict and have it entered and recorded subsequently. Neace v. Commonwealth, 165 Ky. 739, 178 S. W. 1062; Commonwealth v. Wilson, 215 Ky. 743, 286 S. W. 1065; Pardue v. Commonwealth, 225 Ky. 60, 7 S. W. (2d) 512; Jones v. Commonwealth, 238 Ky. 607, 38 S. W. (2d) 461. This last case was decided May 1, 1931. It was proper for the court, upon his attention being called to the failure of the clerk to enter this judgment, to have it then entered and signed in the proper place on the order book. There is no attempt made to show the judgment and verdict as entered are erroneous. Davis v. Commonwealth, 230 Ky. 589, 20 S. W. (2d) 455. Therefore we are of the opinion that, if the order was entered as set out in the bill of exceptions, that being the only authority we have for that assertion, the court proceeded in the proper manner to have the order entered and signed, and, since the appellant in no way suffered therefrom, no prejudicial error was committed.

The third and fourth ground complained of by the appellant goes to the competency of the evidence introduced by the commonwealth. It will be necessary to give a brief statement of the facts and circumstances as outlined in the evidence. Honey Babe Epps was killed on

the 25th day of February, 1931, in the yard of the residence of Mrs. Nancy Daniels in the city of Middlesboro. The deceased and the appellant were brothers-in-law; the appellant having married the sister of deceased. On the morning of the tragedy, the appellant had administered to his wife a pretty fair beating. She had written a note to her sister, Ella Epps, telling of this act, and asking that Honey Babe cause some legal action to be taken against the appellant. Late in the afternoon the appellant went to the home of Mrs. Daniels to get some slop for his pigs, and, after he had been there for some time, Honey Babe came. When he came in, the appellant asked him where he had been, and he replied, "Over in Happy Hollow. I thought I would stop as I came by," to which appellant replied, "Like Hell you did." They had a few more words of conversation, when Epps walked out of the house followed by the appellant. The shooting occurred within a few minutes. There were no eyewitnesses to the shooting, but, when Mrs. Daniels, who was the first witness to reach the scene, arrived, Epps was staggering and falling from the effects of a pistol wound. The appellant had a pistol in his hand, and one was found near the body of Epps. No witness appears to know how many shots were fired, but all agree there were several. The appellant, when asked by Mrs. Daniels why he shot deceased, replied, "I have done my part by him and Norah and I have not done anything more than I would do if he would jump up." The pistol in the hand of Honey Babe or near his body was examined by several witnesses, who testified that it had not been shot recently. Mrs. Daniels says that the pistol was not smoking when she arrived just immediately after the shooting and before the deceased had fallen. The appellant's daughter testified that on the morning of the tragedy he told her that he had told Norah that she would go to another funeral in the Epps family in a day or two. Vedie Daniels said the appellant said to her mother immediately after the shooting that he had done no more than he would do again. "God damn him, let him die."

The appellant, in his own defense, testified that immediately after they stepped out upon the porch of Mr. Daniels' residence the deceased asked him, "What the God damn hell did you beat Norah up for?" He said, "Because it was my duty"; then when Epps stepped off the porch he reached for a 2x4; that he (the appellant) said to him, "Look here, you will not do a damn thing;

you are not going to do a damn thing." "The deceased either did not get hold of the 2x4 or it slipped out of his hand. At any rate, he did not get it. Epps then reached for his gun and fired. Appellant then reached for his, and the deceased fired again. Then he drew his gun up and fired at him the third time. He fired twice and missed Epps both shots. He then stood there and waited to see what the deceased was going to do. Epps, running towards the left, shot back at the appellant and ran to a little bunch of weeds, and got behind them. He then shot twice, and Epps fell the last shot. He says the deceased shot four or five shots at him and that he fired four shots at him. He denied that he had made any threats against the deceased. The conversation had with his daughter in which he said his wife would attend another funeral in the Epps family was made in reference to his objections for her to go to her mother's. His objections were based upon the experience he had had in that his wife drank to excess when she visited her mother, and he meant that, if she went there to stay, the excessive drinking would kill her in a few weeks, and that was the funeral he had reference to when talking with his daughter.

The appellant introduced in his behalf Walter Evans, Arthur Evans, May Evans, and Carry Dooley, none of whom saw all the difficulty. Walter Evans heard the shots, and said there were nine or ten shots fired. He did not go down to the place where the shooting occurred until after the officers had arrived. He saw the deceased stagger and fall from a distance of about five hundred feet. Arthur Evans was next introduced. This is a little boy seven years old. When the defendant offered this witness, the presiding judge, in order to test his qualifications, asked him a number of questions. He asked him about his age. He answered that he was seven, but he did not know when. He asked him if he knew what it was to be a/ witness, and he said he did not. He asked him if he knew what would be done to him if he were sworn as a witness and did not tell the truth. He said he did not. He asked him if he knew what would become of him if he told a lie, and he said he did not. He asked him if he knew anything about how this killing occurred, and he said, "No, sir." The jury was then sent out of the room, or the witnesses questioned in the absence of the jury. The court refused to allow his evidence to go to the jury; the court saying that, "It

appears that this child is not old enough to realize the importance of an oath or the significance of an oath and therefore the court thinks it is improper to introduce him and does not consider his evidence of sufficient relevancy to be allowed to go to the jury; to which the defendant excepted.''

The evidence of the appellant tends to establish upon his part a case of self-defense. The evidence is conflicting upon that point, but quite sufficient, we think, to support the verdict of the jury. In the first place, although there was a pistol in the hand of the decedent at the time he was staggering and falling and found near his body after he had fallen, yet it was proven by witnesses for the commonwealth that at the time he fell the pistol in his hand was not smoking. Members of the police force of Middlesboro examined the pistol, and testified that it had not been shot recently. This fact, coupled with the threats made by the appellant concerning the family of his wife in general and his attitude immediately before and immediately after the killing, was very material in establishing the state of mind and whether he had committed the act in self-defense or as a result of some pre-existing malice. These were the questions before the jury for determination under the state of record. It is a well-settled rule of this court that the verdict of the jury will not be set aside, unless it is flagrantly against the evidence. Branham v. Commonwealth, 223 Ky. 233, 3 S. W. (2d) 629. The verdict at last depends upon the credibility of witnesses, which is peculiarly and exclusively a question for the jury, and that body has the undisputed right to believe any witness or set of witnesses to the exclusion of any other witnesses or to believe part and disregard any other part of the evidence that they do not believe, Haynes v. Commonwealth, 194 Ky. 469, 239 S. W. 780, and, if there is any evidence affording a reasonable ground upon which it can be sustained, it cannot be said to be palpably against the evidence. Abdon v. Commonwealth, 237 Ky. 21, 34 S. W. (2d) 742; Shepherd v. Commonwealth, 236 Ky. 290, 33 S. W. (2d) 4; Newsome v. Commonwealth, 236 Ky. 344, 33 S. W. (2d) 36; Kirk v. Commonwealth, 192 Ky. 460, 233 S. W. 1060. We are of the opinion that the verdict is amply supported by the evidence. Therefore we find no merit in this contention.

It is next contended that the court permitted the commonwealth to prove threats made by the appellant con-

cerning members of. the Epps family. The complaint is that these threats were too general in their nature and not direct threats against the decedent.. The court did strike the evidence of Della Mathews, who testified about a threat made at the home of Mrs. Epps when a brother of Mrs. Swanigan was a corpse, when he said, if his wife did not come home, there would be another God damn death in the Epps family. The court admonished the jury that they could not consider this, as he did not make any threats against the decedent, and that they had had no trouble at that time, and for that reason it was withdrawn. So the appellant cannot complain of this testimony. The other threats that he made to his daughter we are inclined to believe were sufficiently direct in the light of subsequent events to be admissible. Roberson on Criminal Law, sec. 497.

It is also complained that Marian Swanigan, the daughter of the appellant, was allowed to testify of the mistreatment she had received at the hands of appellant. A close examination of this complaint discloses that it was brought about in a large measure by the character of questions indulged in by the attorney for appellant, and, on being pressed by appellant's counsel on questions of her interest or bias or ill feeling towards appellant, the witness was placed in a circumstance where the peculiarities of human nature made these answers spontaneous over which no court can control; more especially to control a woman when by innuendoes it is sought to cast aspersion upon her character or virtue. In the main we do not believe that the indulgence in this character of evidence prejudices the substantial rights of the appellant or that the jury was unduly influenced thereby.

The last complaint is that the court erred in refusing to allow the child, Arthur Evans, to testify. It will be observed that, when this child was placed upon the stand, the preliminary examination was conducted by the trial judge in a deliberate, fair manner. He asked the child some six or eight questions pertinent to his qualifications. His answers were such as to show an absolute lack of understanding on his part of the nature of an oath, the duty of a witness, and the consequences of misstating the facts. In the case of Merchant v. Commonwealth, 140 Ky. 12, 130 S. W. 793, 794, the court said:

"The law recognizes no exact period of time at which infants are allowed to testify. This depends upon the individual capacity of each witness. When-

ever it is apparent that the witness knows right from wrong and recognizes that punishment by the Almighty will follow falsehood, then he is permitted to tesify and the jury authorized to give such credit to the testimony as they think it deserves."

An examination of the hearing conducted by the trial judge shows that the child absolutely failed to qualify under the above rule. This is a question which addresses itself to the sound discretion of the court. The trial judge did not abuse a sound discretion when he refused to permit this child to testify, but that his ruling was within the rule announced in the Merchant case, supra.

We have carefully gone into all the grounds assigned by the appellant, and are of the opinion that the appellant had a fair and impartial trial, and that no errors prejudicial to his substantial rights were committed by the trial court, and that, inasmuch as the jury believed him guilty, after hearing the evidence, and under the proper instructions of the court fixed his punishment at ten years in the penitentiary, the judgment of the lower court is therefore affirmed.