## Wallace v. Commonwealth.

### And four other cases.

(Decided June 4, 1929.)

778

WILLIAM L. WALLACE, LESLIE W. MORRIS and FOWLER, WALLACE & FOWLER for appellant.

J. W. CAMMACK, Attorney General, and S. H. BROWN, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE LOGAN—Reversing.

There were primary elections held in this state on August 6, 1927, at which the Democratic and Republican Parties had candidates for all state offices as well as for certain district officers. James A. Wallace, the appellant, was a candidate at that Republican Primary for the nomination for auditor of public accounts for the state of Kentucky, and one of his opponents was John M. Perkins. The result of the vote was close, and, as the returns came into the office of the secretary of state, first one of these candidates was ahead and then the other. When the returns were all in, the state board of

election commissioners met to canvass the returns on Monday, August 22d. In making a comparison of the votes certified in the official certificates with the votes entered on a book in the office of the secretary of state it was discovered by the state board of election commissioners that there was a discrepancy between the certificates and the book kept by the secretary of state.

The proof shows that, when the official returns came in to the secretary of state they were turned over to Mr. Roberts, an employee of that office, who copied the returns in the certificate on a book kept for that purpose. His work was done with great care, and was checked and rechecked before the certificates were placed in the safe where they were kept in the office of the secretary of state. When the state board of election commissioners came to the county of Fulton in its tabluation, they discovered that the vote on the book kept in the secretary of state's office showed 30 votes for the appellant, while the original certificate showed that 130 votes had been cast for him. When they reached Kenton county, they found that the book showed 731 votes for appellant, while the original certificate showed 931. The book showed the vote in Knox county for appellant to have been 572, while the original certificate showed 1,-572. The book showed that the vote of Lincoln county was 91 for appellant, and the original certificate showed 191. The book showed 61 votes for appellant in Shelby county, while the original certificate showed 161.

The grand jury of Franklin county returned five indictments against appellant charging that he had made changes in the original certificates. It was charged in one indictment that he placed a figure "1" before the figures "61" shown in the Shelby returns, thus making a change in his favor of 100 votes; that he placed the figure "1" before the figures "30" in the returns in his race from Fulton county, thus increasing his vote by 100; that he placed a figure "1" before the figures "572" in the returns in his race from Knox county, thus increasing his vote, according to the returns, 1,000; that he placed a figure "1" before the figures "91" in the returns in his race from Lincoln county, thus increasing his vote 100; and that he changed the first figure in the returns in his race from Kenton county which showed 731 votes cast for him to a "9," thus making the returns show 931 votes cast for him. The net result of the changes as charged in the indictments was to make the

returns show a vote 1,500 greater than he received, which was sufficient to change the result of the election.

By agreement of the appellant and those representing the commonwealth, the five separate indictments were tried before a jury on the same evidence. The jury was instructed separately as to each charge, and returned a verdict finding the appellant guilty on each indictment, and fixing his punishment at 2½ years in the penitentiary for each offense, or 12½ years for the combined offenses.

A demurrer was interposed to each of the indictments, and was overruled. The attack on the indictments constitutes one of the major grounds relied on for a reversal by appellant.

Omitting the caption and the signature of the commonwealth's attorney, one of the indictments is as follows:

"The Grand Jury of the County of Franklin, in the name and by the authority of the Commonwealth of Kentucky, accuse James A. Wallace of the crime of forgery committed as follows, viz: The said James A. Wallace in the said County of Franklin on the 27th day of September, A. D. 1927 and before the finding of this indictment, did unlawfully, willfully, and feloniously alter the certification of returns of the Republican Primary election from Knox County, held on Aug. 6th, 1927, in that in the returns for the race for Auditor of Public Accounts, he did change said returns so that the vote for the defendant in said race appeared as '1,572,' said returns being originally '572,' said change being effected by placing the figure '1' before the figure '5' against the peace and dignity of the Commonwealth of Kentucky."

It is admitted in briefs that all of the five indictments are in the same language except as to the description of the alteration made. It is insisted by counsel for appellant that the indictments are not sufficiently direct and certain to meet the mandatory requirements of section 124 and subsection 2 of section 122 of the Criminal Code of Practice when the two sections are read together. Section 124 requires no more than that the indictment must be direct and certain as regards the offense charged.

Subsection 2 of section 122 is as follows:

> "The indictment must contain . . . . a statement of the acts constituting the offense, in ordinary and concise language, and in such a manner as to enable a person of common understanding to know what is intended; and with such a degree of certainty as to enable the court to pronounce judgment, on conviction, according to the right of the case."

The indictments each charge that the returns from the county mentioned showed a certain number of votes received by appellant, and that appellant so changed the returns as to show that he received a greater number of votes, and the exact change, which it is alleged appellant made, is set out in each indictment. Certainly each indictment contains a statement of acts constituting the offense in ordinary and concise language, and in such manner as to enable a person of common understanding to know what is intended. We could suggest no language which would be more simple, more direct, and more certain. No individual, unless a mentally defective person, could fail to understand what he was charged with, if proceeded against under such an indictment.

But it is urged that in the accusatory part the indictments charge the crime of forgery, while in the descriptive part they charge the statutory crime of altering a certificate of election as defined in section 1581, Ky. Stats., for which a penalty different from that of the common-law charge of forgery is prescribed.

Section 1581, Ky. Stats., is as follows:

> "Any officer or other person who shall wilfully alter, obliterate, or wilfully secrete, suppress or destroy the certified poll book, return or certificate of an election, wilfully and unlawfully alter the poll book before it is certified; or any officer who shall make, or aid in making, or authorize the making up of any false or fraudulent poll book, or certificate of an election return, shall be deemed guilty of forgery, be confined in the penitentiary from one to five years, forfeit any office he then holds, and be disqualified from ever holding any office."

The indictment charges in plain and simple language the alteration of an election return. It therefore

charges the offense denounced by section 1581. But it is suggested by counsel for appellant that we have no statute in this state covering specifically the common-law crime of forgery. That is true, as section 1188, Ky. Stats., is not so much a definition of forgery as a provision defining penalties for certain acts of forgery. Appellant was not indicted for the crime of forgery under the common law, or forgery for which a penalty is prescribed by section 1188. He was indicted for a statutory offense which was named forgery by the General Assembly when the statute was enacted.

It is argued that the indictments charge in the accusatory part the common-law crime of forgery, but that is not true, as they charge a statutory offense in the language of the statute which is denominated forgery by the statute. Appellant relies on the case of Elliott v. Commonwealth, 194 Ky. 576, 240 S. W. 61, where this court held that, where a statutory offense is given no name, the indictment should, in naming the offense, follow the statute. Counsel for appellant seem to have overlooked the name given the offense in the statute. It is urged that the indictment does not follow the language of section 1581 in naming the offense, but in that counsel are mistaken. It does follow the language of the statute in naming the offense.

Appellant relies on the case of Deaton & Boggs v. Commonwealth, 220 Ky. 343, 295 S. W. 167. But the case is not in point. The court held there that section 124 and subsection 2 of section 122 of the Criminal Code of Practice must be considered together, and, when so considered, their requirement is mandatory that the indictment must be direct and certain as to the offense charged. These indictments are direct and certain in the accusatory part in charging the offense of forgery, which is the name given to the crime denounced by section 1581, Ky. Stats. The descriptive part of these indictments contains the required certainty prescribed by the aforesaid sections of the Criminal Code.

It is further contended by counsel for appellant that the indictments are insufficient because facts constituting the necessary and essential elements of common-law forgery are not alleged in the descriptive part of the indictment. They rely on the case of Sanlin v. Commonwealth, 212 Ky. 394, 279 S. W. 648. The indictment considered in that case was for the offense mentioned in section 1188, Ky. Stats. This is not an indict-

ment under that section. If it were an indictment under that section, the contention made by counsel might be upheld. But, since it is an indictment under an entirely different section, the case is not in point.

Another point urged against the validity of the indictments is that the instruments which it is charged were forged are not set out according to their tenor in the indictments. Again counsel are attacking the indictment as if the charge was one of common-law forgery. The statute governing these cases defines a statutory offense and not a common-law offense, and the offense is described substantially in the language of the statute. It was not the intention of the General Assembly in the enactment of section 1581 that anything should be charged in the indictment other than the alteration of the returns in the election if that was the gist of the offense, and these indictments make the specific charges, name the election, the particular returns which were altered, and the county making them.

It is insisted that the indictments do not measure up to the requirements of the opinion in the case of Kinnaird v. Commonwealth, 134 Ky. 575, 121 S. W. 489. The court was there considering an indictment returned under section 1352, Ky. Stats., which provides a penalty against a person who sells, lends, gives away, or shows indecent or obscene literature. The indictment was based upon certain letters which a married man had mailed to a young lady. The letters were not copied in the indictment. A demurrer was sustained to the indictment because it did not contain a copy of the letters and did not show that they were not available. The court there said:

"A person who is charged with the commission of a penal or criminal offense that grows out of a writing, or alteration in a writing, made by him is entitled, under all the rules of criminal procedure, to be informed by an inspection of the indictment of the nature of the charge, so that he may be prepared to meet it; and he can not have this information unless the writing alleged to have been executed or altered is incorporated in the indictment. If, however, the writing is lost, and for this reason it can not be set out in the indictment, it will be sufficient to state the fact, and set out the substance of the writing in words and figures as

near as may be done, and so, if the writing is in the possession of the accused, and for this reason can not be obtained by the grand jury.''

In that case the defendant was charged with the offense prescribed in section 1352, Ky. Stats., and, unless the letters were set out in the indictment, he had no means of knowing the exact nature of the charge against him. He was entitled to know the alleged contents of the letters, and he was entitled to this information by an inspection of the indictment. The court said that he could not have the information, unless the letters were copied in the indictment. The facts are quite different from the matter we are now considering. When appellant examined the indictments, he obtained exact information as to what he was charged with. He could not be left in doubt if he read the indictments. He was told by the indictments exactly what the charge against him was, even down to informing him of the exact figure which it was alleged, he had altered, or inserted, in a certain election return from a named county.

Another contention is that the indictments are insufficient because they contain no allegation of intention on the part of appellant to defraud. It is true that in the case of Barnes v. Commonwealth, 101 Ky. 556, 41 S. W. 772, 19 Ky. Law Rep. 803, in defining the essential ingredients of forgery which must be alleged in the indictment, this court said:

"It is essential to make out for the Commonwealth three essential ingredients, viz., that the defendant forged the writing; that he did so with fraudulent intent, and that the instrument forged must be apparently capable of effecting a fraud.''

It was said, however, by this court in the case of Morse v. Commonwealth, 129 Ky. 294, 111 S. W. 714, 33 Ky. Law Rep. 831, that:

"An evil intent is a necessary ingredient in the commission of arson, burglarly, larceny, murder, and almost every other felony, including embezzlement, and must be charged in the indictment; but the law will imply the intent from the acts of the accused when they are sufficient to establish his guilt, and this upon the ground that every accountable person is responsible for the consequences that flow from his acts.''

The indictments charge that appellant "did unlawfully, wilfully, and feloniously alter the certification of returns," in that he "did change said returns so that the vote for the defendant in said race appeared as '161,' said returns originally being '61,' said change being effected by placing the figure '1' before the figure '6.'"

He was charged with altering the returns in such a manner as to increase his vote, and we deem it unnecessary for these indictments to specifically state that he did so with a fraudulent intent, as under the circumstances alleged in the indictments the alterations could not have been made other than with a fraudulent intent.

Another point urged against the validity of the indictments is that they do not allege that the alterations were made without authority, and counsel cite and rely on the case of Commonwealth v. Bowman, 96 Ky. 44, 27 S. W. 816, 16 Ky. Law Rep. 222. The charge against Bowman was that he forged, or altered, a note, but contained no allegation that it was done without authority. No one has authority to alter, or change, a certificate of election returns after it has been certified by the county board of election commissioners to the secretary of state. The law would not allow a change in the certification in the manner in which it is alleged in the indictment that it was made. Therefore any change so made must have been without authority. It is suggested that appellant may have altered the certification of returns at the instance and request and with the authority of those who were actually authorized under the law to certify the returns. Those who were authorized under the law to certify the returns could not make alterations such as it is charged by the indictments were made. Therefore they could not authorize some one else to do that which they could not have done themselves.

Still another point is urged against the indictments, in that it is urged that they do not allege the name of the party whom it was intended to defraud. These indictments do not charge the crime of obtaining money or property by false pretenses. The statute is aimed at the alteration of election returns, regardless of whether some person is defrauded. The intention of the Statute is to preserve inviolate the election returns, and that is its primary purpose. Counsel for appellant devote considerable space in their brief to an effort to show that the indictments do not contain definite information showing

what certifications of returns were altered. The indictments show that the certifications of returns which were altered were in the race for auditor of public accounts in the Republican primary held on August 6, 1927, and that the alteration was in the number of votes received by appellant.

Counsel rely on the case of Commonwealth v. White, 109 S. W. 324, 33 Ky. Law Rep. 70. In that case the court had under consideration an indictment under section 1308, Ky. Stats., against the drawing of a deadly weapon upon another person, or pointing a deadly weapon at another person. The indictment was held bad because the descriptive part of it was not sufficiently direct and certain, in that it did not describe the kind of weapon which was pointed. The court in that case said:

"The rule is that, 'where the words of the statute are descriptive of the offense, the indictment will be sufficient if it shall follow the language and expressly charge the exact offense of the defendant.' But this rule applies only to offenses which are complete in themselves, when the acts set out in the Statute have been done or performed."

The argument that the indictment might relate as well to the certificate of the precinct officers as to the certificate of the county board of election commissioners is not tenable. The indictments charge the alteration in the returns from a particular county, and not from a particular precinct in a county. The certificate altered as alleged in the indictment is the one certifying the returns of the Republican primary election from a particular county. There is only one such certificate, and that is the certificate made by the county board of election commissioners to the secretary of state for the use of the state board of election commissioners. This court judicially knows that the candidate for auditor of public accounts must be nominated by the Republican Party in a state-wide primary election when there is a primary held for that purpose. The court also judicially knows that it is the duty of the board of election commissioners in each county to certify the returns from that county to the Secretary of State in all of the races where the nominations are made by the Republican voters of the state at large.

Another contention made by counsel for appellant is that the indictments contain no allegation that there

were any valid certifications of returns of the Republican primary election from the counties in question. This was unnecessary. If it should be required that an indictment in such a case should allege that the certificates made up by the county board of election commissioners were valid, it would also be necessary to show that the board had been legally appointed, and that the election was legally held under authority of law. When the indictment alleged that the alteration was made in the returns from the counties mentioned, there was no necessity for further allegation on this particular point. The presumption is that the officers did their duty and made up the returns in accordance with the provisions of the laws governing such matters.

Appellant cites the cases of Commonwealth v. Barney, 115 Ky. 475, 74 S. W. 181, 24 Ky. Law Rep. 2352; Farmer v. Com., 91 S. W. 1129, 28 Ky. Law Rep. 1369, where it was held that a construction of a statute that would make a person guilty regardless of the question of intent is not to be preferred to a construction requiring a fraudulent intent. That is the general rule. The alteration of election returns, or anything which is the basis of the returns, is an offense under the provisions of section 1581, Ky. Stats., whether the perpetrator of the offense intended to defraud some person or otherwise. If the alteration is willful, unlawful, and felonious, as alleged in these indictments, it makes no difference whether it was done with the purpose of defrauding some other person. It is the violation of the laws providing for the purity of elections which is denounced by section 1581.

We have examined with care each point urged against the validity of the indictments by appellant, and we find it is without merit. Appellant was deprived of no right under the laws, or the Constitution, when he was placed on trial on the charges found in these indictments.

But counsel for appellant say that, conceding the validity of the indictments, there was not enough competent evidence produced before the jury to authorize the submission of the question of guilt or innocence to the jury. The commonwealth established by the officers in the respective counties making the returns that the correct returns from the counties in question showed as indicated by the book kept in the office of the secretary of state, and that the returns from these counties when

they reached the state board of election commissioners had been changed. The change took place between the time when the certifications left the county and the time when they were delivered to the state board of election commissioners. The commonwealth also established that, when the certificates reached the office of the secretary of state, and were entered on the book therein kept, they were as when they left the hands of the county officials who forwarded them to the secretary of state. The commonwealth further established that the returns had been tampered with when they were delivered to the chairman of the state board of election commissioners.

As the evidence was presented, it was made to appear that the returns were altered after they reached the office of the secretary of state and before they were delivered to the state board of election commissioners, although the commonwealth was not precluded by the evidence from relying on any alteration that may have been made after the certificates were delivered to the chairman of the board of election commissioners, and the time when the board actually commenced the canvass an hour or two later. The evidence is conclusive on any reasonable mind that the alterations were made either in the office of the secretary of state or in the office of the chairman of the state board of election commissioners. The jury was not confined in its consideration of the evidence to the oral statements of the witnesses, but it was authorized to deduce from facts and circumstances surrounding the entire transaction. With this general statement in view, we will proceed to examine the evidence to ascertain whether the appellant was sufficiently connected with the offenses charged to authorize the submission of the question of guilt or innocence to the jury.

The certificates from the counties began to come into the office of the secretary of state within a few days after the general election. As they came in, the envelopes containing them were opened by Mrs. Cromwell, secretary of state, and they were turned over to C. D. Roberts, an employee of the office, who entered them on the book described above. The entries on the book and the original certificate were carefully checked by Roberts, assisted by Miss Mary Malloy, another employee in the office. When the entries had been made on the book and had been checked against the certificates,

the original certificate was then placed in the safe in the private office of the sceretary of state. During the days in which the returns were coming in, many people visited the secretary of state's office, but usually they were satisfied by an examination of the book kept by Roberts. The returns were intact without alteration in the counties in question in the auditor's race on Saturday, August 20th succeeding the primary. We know this to be true, because the appellant himself is authority for the statement that the original returns which he checked on that day indicated the correctness of the book kept by Roberts. We know, therefore, without conjecture or surmise, that the original returns from these counties had not been altered in the race for auditor at the time appellant examined them on Saturday morning August 20th. The changes necessarily took place between about the hour of 11 o'clock a. m. on Saturday, August 20th and about the hour of 10 o'clock a. m. on Monday, August 22d. The question to be determined is whether there is anything in the evidence of a probative nature which directly connects appellant with the unlawful act of making the changes, or were such facts developed in the evidence as would enable the jury to infer beyond a reasonable doubt that the changes were made by appellant? This necessitates a detailed statement of the movements of appellant and his activities on Saturday, Sunday, and Monday, which are the vital days so far as the charges in the indictments are concerned.

He knew that the race between him and Mr. Perkins was very close, with nearly all of the returns in. Probably all of the returns were in by the 20th, except those from Jefferson county. The reports which he had indicated that he was running slightly behind Perkins. He came to Frankfort early Saturday morning from Lexington. Mr. Moore, the mail carrier who delivers mail to the capitol, leaves the post office around 8 o'clock, and delivers mail along the streets until he reaches the capitol, usually about 9 o'clock, and there he delivers mail to the different departments. About 8:45 on Saturday morning he saw the appellant on the streets going towards the state capitol. The appellant arrived there a short time thereafter, and requested some of the attaches of the office of the secretary of state to allow him to examine the returns from the different

counties. At that immediate time Mr. Roberts, or some one else was using the book, and he was requested to wait for a few minutes and then he might have access to the book. He asked for a large sheet of paper with the names of the counties on it, but was unable to obtain such a sheet in that office. He crossed the hall to the office of the state tax commission where he obtained a sheet of paper such as he desired.

Upon his return to the office of secretary of state, he examined the book kept by Roberts, and entered upon the sheet of paper with a pencil the returns in the auditor's race opposite each county. He was engaged for some time at the desk, and, when he had completed it, he inquired of Miss Malloy if he could see the original returns from some of the counties. Miss Malloy took him in to the private office of Mrs. Cromwell, and there made known his request, and the privilege of seeing some of the original returns was accorded him. The side of the desk in the private office of Mrs. Cromwell is next the door which opens out into the large office in which the employees work. The door was open. Mrs. Cromwell sat on the opposite side of the desk facing the door, and facing the appellant. Miss Malloy inquired of the appellant the names of the counties from which he desired to examine the returns. He gave her the names of 30 counties, and she wrote the names on a scrap of paper with a pencil making red letters. With the list in her hand, she went to the safe about 15 feet away. The returns from the counties had not been arranged alphabetically, so she was required to take them out of the safe and search for the particular counties desired. As she found the returns from the counties, she checked off the name of the counties from her list, and, when she had a batch of a few counties, she carried the returns to Mr. Wallace and placed them before him on the desk. He examined the returns, and compared them with the entries which he had made on the sheet of paper.

Miss Malloy testified, on direct examination, that, when she delivered one batch of returns, she went back to the safe to search out another batch which she carried to the appellant, and that, when he had finished with the batch he was examining, she returned it to the safe. This method was followed until he had examined the returns from 30 counties. No one was in the private office other than Mrs. Cromwell, Miss Malloy, and the

appellant, with one exception, which will be noted later, excluding the mail carrier who entered the office to deliver mail. Nearly all of the time Mrs. Cromwell sat facing the appellant while he was making the examination. The telephone, almost at her back, rang while the appellant was in the office, and she moved over to the telephone, about 6 feet away, and received the message. Her impression is that she was there for a very brief space of time, although, of course, she is not absolutely certain.

Miss Malloy, according to the testimony of appellant, when she handed him a batch of the returns, stood waiting while he checked them against the entries on his paper, and then returned them to the safe before she brought him another batch. She is not entirely clear, taking her evidence as a whole, as to whether she waited for him to finish one batch before she brought him another. It is really not material, and is mentioned because it is the only point of contradiction between Miss Malloy and the appellant as to what took place in the private office. Mrs. Cromwell was observant of what went on. Neither she nor Miss Malloy saw appellant make any change in any return, and nothing took place which aroused their suspicion. When they testified, they did not recall whether he had in his hand a pen or a pencil. He testified that he had in his hand a pencil which he used in checking.

The only other person in the private office during this time was Mrs. Mildred Moss, a newspaper reporter, who came in for the purpose of examining the returns in some of the district races. She saw the appellant sitting at the desk with his back towards the door, and Mrs. Cromwell sitting at the desk facing him, and she saw Miss Malloy at the safe. She went to the safe and asked to examine the returns in which she was interested. In passing by Mr. Wallace she saw that he had either a pencil or a pen in his hand that he was using to check with, but she was not certain whether it was a pen or a pencil, but her impression was that it was a black fountain pen. The only contradictions in the evidence of what took place in the private office is that noted between the evidence of Miss Malloy and the appellant, and the statement of appellant that he had a pencil and the impression of Mrs. Moss that he had a pen in his hand.

The returns from the counties on which the alterations were made were included in the list of counties made up by Miss Malloy at the request of appellant. After he completed the examination, he stated in the presence of Miss Malloy and Mrs. Cromwell that he found the returns correct, in that they checked with the entries on the sheet of paper which he copied from the entries on the Roberts' book.

Before leaving the office of the secretary of state, there is one other fact to be noted, and that is that John A. Goodman, at the time clerk of the Court of Appeals, came into the office, and he and the appellant had a brief conversation, amounting to little more than a reference to the fact that it appeared that each of them had been defeated in the primary. Goodman was a Democratic candidate for the nomination for auditor, and he desired to examine the Roberts book, and appellant gave way until he could make an examination in some particular.

When appellant left the office of the secretary of state, he went to his house on Capitol avenue, which at the time was vacant. He went into the house and looked around for a while, and from there he proceeded to the offices of the highway department at the old Capitol building, where he saw Mr. De Hart, an employee of that department. At the time appellant was engaged in the construction of a road under the supervision of the state highway department, and he had some conversation with De Hart about the work. After leaving De Hart, he went to the place of business of John M. Perkins, his apparently successful opponent in the Republican primary. He testified that he congratulated Perkins on his victory, and pledged him his support in the coming November election. Perkins did not testify. Therefore the statement of the appellant that he congratulated Perkins on his victory stands uncontradicted.

Saturday afternoon appellant returned to Lexington, and then went over to his old home at Irvine. Sunday afternoon he secured his mail, and went to the bank of which he was president to examine it. Mr. Clark, the cashier of the bank, was also there at the time, examining his mail. When he opened the mail on Sunday afternoon, he testified that he found a certificate of the election returns from Rockcastle county, which he checked with the sheet of paper on which he had made entries

the day before, and learned that the certificate which had come to him by mail showed that he received a thousand more votes than his entries indicated. He proves that he received the certificate through the mail by Mr. Clark, who was present at the time, although 'Clark does not testify that he saw him open the envelope containing the certificate.

On Sunday nothing happened at the office of the secretary of state, so far as the evidence discloses, except that Senator Gartin, who at the time was a candidate for the nomination for Senator in the districts embracing Boyd county came to Frankfort and sought out Mrs. Cromwell, and asked her to go with him to her office, so that he might examine the original returns from the four counties in his district. She obligingly complied with his request, and, upon their arrival at her office, she opened the safe and showed him the returns called for. None of the counties have anything to do with the charges in these indictments. No one else was present at the time, and, according to the evidence of Mrs. Cromwell and Senator Gartin, no returns were examined except those from the four counties in which he was interested.

Before taking up the evidence of Monday, it is necessary to go back to Saturday so the chronology may be understood. About 11:45 a. m. on Saturday morning, which was about 30 minutes after appellant had left the office of the secretary of state, Seymour Goodman, a son of John A. Goodman, and an employee in the office of the clerk of the Court of Appeals, went to the office of the secretary of state, and demanded the returns from the counties in the state so that he might turn them over to his father, who, by virtue of his office, was chairman of the state board of election commissioners. Saturday was the day fixed by law for the making of the canvass, but the chairman had notified the Democratic state election commissioner and the Republican state election commissioner to come in on Monday, as he did not believe that the work could be finished in one day, and by postponing the count until Monday the necessity of their remaining over Sunday in the capitol would be obviated. When Seymour Goodman requested Mrs. Cromwell to turn these certificates over to him, she refused, stating that it was her idea of the law that she was under the duty of keeping the returns in her custody until she

could deliver them to the state board of election commissioners. Seymour Goodman was insistent, and he returned to the office of his father, and reported the refusal of Mrs. Cromwell to him. His father turned to a section of the Ky. Stats. which he thought authorized his obtaining possession of the certificates, and delivered the statutes to Seymour, who brought the book to Mrs. Cromwell and read the law to her. Mrs. Cromwell was not satisfied, and again refused to comply with his request unless she should be directed in writing by the Attorney General to deliver the certificates of the returns to the chairman of the state board of election commissioners. She sought an opinion from the Attorney General, and it appears that both Seymour Goodman and Mrs. Cromwell presented the matter in the office of the Attorney General. The Attorney General, or one of his assistants, agreed with Mrs. Cromwell that she was the proper custodian of the certificates until the state board of election commissioners should meet.

On Saturday Miss Malloy worked overtime. Saturday afternoon is a half holiday at the state capitol, but she remained until 1 o'clock or after arranging the returns from the counties in alphabetical order. When she had completed this work, she left the returns alphabetically arranged locked in the safe in the private office of the secretary of state.

During Saturday afternoon, as appears from the evidence of John A. Goodman, he and appellant had a conversation at some place in the city of Frankfort. Mr. Goodman was not certain about the subject of the conversation or where it took place.

Early Monday morning on the 22d John A. Goodman and his son, Seymour Goodman, reached the capitol, and went immediately to the office of the secretary of state for the purpose of obtaining the certificates of the election returns. Neither Mrs. Cromwell nor Miss Malloy had reached the office, and it is not apparent from the evidence whether other employees were in the office when they called. John A. Goodman used the telephone to call for Mrs. Cromwell, but, when he called, Miss Malloy, who appears to have roomed at the house of Mrs. Cromwell, answered the telephone. She was requested by Mr. Goodman to come to the capitol and deliver to him the official election returns. She came in response to that request, and delivered to Mr. Goodman the complete cer-

tifications of election returns, and also turned over to him and his son the Roberts book. They took what they had received to the private office of the clerk of the Court of Appeals. Upon their arrival there, or immediately thereafter, the appellant put in his appearance. The two Goodmans and appellant were present in the private office of John A. Goodman for some time before the arrival of any other person. All of them testified that appellant presented the alleged certificate which he claimed to have received on Sunday showing a greater vote for him in Rockcastle county than had been previously made known. All of them testified that none of the certificates of returns from any of the counties were examined or molested except the certificate of the returns from Rockcastle county was segregated from the others and compared with the certificate which appellant claimed that he had received through the mails on Sunday.

John A. Goodman, according to his testimony and the testimony of appellant and Seymour Goodman, instructed appellant that the certificate which he had received through the mails could not be considered as a substitute for the original certificate sent in from that county. The original certificate from Rockcastle county was not one of those altered after it reached the office of the secretary of state, and it was not one of those for which appellant was indicted, charged with having made the alteration. John A. Goodman, for some reason wholly unexplained, except by the very unsatisfactory reasons given by both the Goodmans and appellant, immediately, without advising with any other person, or without waiting for the two state election commissioners whom he knew would arrive in a few minutes, ordered his son, Seymour, to get in his automobile and go at once to Mt. Vernon in Rockcastle county to find out whether the certificate presented by appellant correctly stated the votes received by him in that county. Seymour Goodman proceeded immediately, but he paused long enough at the east door of the capitol to invite appellant to ride with him as far as Lexington. He left appellant in Lexington with the assurance that he would stop on his return from Rockcastle county and acquaint him with the facts which he should discover.

While he is on his way to Rockcastle county to ascertain whether the certification made by the county

board of election commissioners to the secretary of state, as required by law, is a correct certification, or whether it is impeachable by a paper purporting to be a certification mysteriously in the hands of appellant, we will return to the proceedings before the state board of election commissioners. Judge Dysard, the Republican member, was the first to arrive, as we gather from the evidence, although Dr. Stout, the Democratic commissioner, came in about the same time. Neither of them was advised by John A. Goodman at the time that he, through his son, Seymour, was making an independent investigation of the election returns from Rockcastle county. There is one significant fact, that is, it may have been significant to any jury trying the facts, and that is that, when the election returns were delivered to the Goodmans on Monday morning, they were alphabetically arranged, if the testimony of Miss Malloy and Mrs. Cromwell truly reveals the facts in relation to their arrangement.

When Judge Dysard arrived about the time of the departure of appellant and Seymour Goodman, he testified that one of the first things that he and John A. Goodman did was to arrange the certificates in alphabetical order. When this was done, the canvass commenced. The chairman of the commission, who under the law is the presiding officer without a vote except in case of disagreement between the other two, called the figures from the original returns, while Judge Dysard compared the reported figures with the entries in the Roberts book. When they got down to Fulton county, which is the first one from which the returns were altered, it was discovered that the figures then appearing on the certification did not correspond with the figures on the Roberts book. The same thing happened when the counties of Kenton, Knox, Lincoln, and Shelby were reached; that is, it was discovered that the original certificates had been altered after the returns in the Republican race for auditor had been entered on the Roberts book. The returns in that race from the counties mentioned were not considered at the time.

On Monday afternoon John A. Goodman received a telegram from Mr. Nicely, the clerk of the Rockcastle county court, which was to the effect that the returns in the alleged certificate received by Wallace in the mail were correct, or rather he stated that appellant received

1,228 votes. in Rockcastle county instead. of 228 votes, indicated by the official returns received, by the secretary of state. The state board of election commissioners adjourned until Tuesday morning.

We are not advised as to the length of time that Seymour Goodman remained in Rockcastle county on Monday, but he returned to Frankfort, stopping on his way home at Lexington to report to appellant what he had found. The substance of his report was that the appearance of things indicated that appellant had received 1,228 votes in Rockcastle county, although there were some suspicious indications of alterations, but his opinion was that the returns were all right. He left the alleged certificate appellant had received through the mails in his possession at that time.

The next morning the state board of election commissioners met again, and appellant was present, as was John M. Perkins, his successful opponent in the primary. Judge O'Rear was acting as attorney for Perkins. Seymour Goodman was present to make his report, and the appellant was present, and it seems that there was an idea prevalent that the state board of election commissioners might hear evidence and determine whether the official returns received by the secretary of state should be considered, or whether there should be substituted for the official returns the certificate received by appellant. There was considerable discussion; Judge O'Rear protesting that the state board had no authority to consider any returns except those officially certified to the secretary of state. It was finally agreed, however, that the county court clerk, Nicely, should be requested to appear before the state board on Thursday morning with the returns from his county. The board adjourned until Thursday morning. Perkins, with one of his friends, expeditiously proceeded to Rockcastle county, and appears to have taken the county clerk and all of his election returns to Louisville. This was on Tuesday afternoon. Appellant consulted with his nephew, an attorney of high standing, and they concluded that they would proceed to Rockcastle county to inquire into the facts, and ascertain, if possible, the true condition of affairs. They arrived there about dark, and, when they got in touch with a deputy county court clerk and were admitted to the office, the appellant testified that they found nothing there that would indicate

that an election had been held. The evidence had been taken by the clerk to Louisville.

Appellant returned to Lexington, and finally got in touch with Nicely at the Brown Hotel in Louisville by telephone. He and his nephew went to Louisville Wednesday morning and met Nicely in the lobby of the hotel. Appellant inquired about the election returns, and learned from Nicely that the original certification to the secretary of state was correct, and that the certificate which had been sent to appellant by some one unknown was incorrect. Little more took place other than the statement by appellant to Nicely that he wanted nothing to do with the matter, if there was any suspicion about the correctness of the returns for him in the certificate which he had received through the mails, and he returned the certificate then and there to Nicely. Appellant prepared two letters which appear in the record, one addressed to Perkins, and the other to the state board of election commissioners. He briefly recited that there was some suspicion surrounding the returns from Rockcastle county, and that he did not desire the nomination with a cloud upon it, and for that reason he requested the state board to award the certificate of nomination to his opponent, Perkins, and pledged his support to Perkins in the final election.

The state board of election commissioners made a report of its findings in regard to the Rockcastle county returns to the effect that crime had been committed and a fraud had been perpetrated in an effort to substitute one set of returns for another, but, of course, the board made no attempt to fix the responsibility. The certificate of nomination was awarded to Perkins.

There is one other fact in connection with this mysterious certificate which was sent to appellant that should be stated. It was signed by the county board of election commissioners for Rockcastle county, and an examination of the signatures under a magnifying glass in comparison with the signatures on the original certificate disclosed such a similarity in the signatures as to lead to the conclusion that they were the same. There was evidence to this effect, although Judge O'Rear, who made the examination, did not testify. The certificate had been lost, and could not be produced at the trial.

The returns in the office of the county court clerk in Rockcastle county were criminally changed by some out-

law thoroughly familiar with election machinery and who was learned in the handling of figures so as to obtain a definite and certain total by adding a little here and a little there to unrelated numbers. It is made to appear, beyond all question of doubt, that the votes cast for appellant in that county in all of the precincts aggregated 228 votes, and the votes as indicated on the back of the poll books in the various precincts were changed a little here and a little there so as to make an exact increase of 1,000 votes in the total for appellant. That was not all that was done by the criminal who attempted to perpetrate the fraud. The tally sheet made up by the county board of election commissioners showing the vote received by appellant in each of the precincts of the county was also changed so as to make it correspond with the fraudulent entries in the back of the poll books, so that, when the tally sheet was added, it showed a total, after the alteration, of 1,228 votes for appellant, when he received only 228 votes in the county. Not only was the fraudulent change made in the returns found in the back of the poll books and on the tally sheet, but some one prepared a fraudulent certificate showing the result of the election in that county one thousand votes more favorable to appellant than was shown by the official returns. That there was a deliberate, well thought out and skillful felony committed by one or more persons in Rockcastle county in connection with this matter is not subject even to the slightest doubt.

Omitting from consideration, for the present, the evidence of the fraud in Rockcastle county, we are called upon to determine whether there was enough evidence to justify the submission of the case to the jury on the charges contained in the indictment; that is, that appellant altered the returns from the five counties mentioned. He had the motive to do so, and a discussion of the motive is unnecessary. It is shown that he had the opportunity on two occasions; one in the private office of the secretary of state, and the other in the private office of the clerk of the Court of Appeals. The returns from these counties were certainly shown to have been in his hands in the private office of the secretary of state. The changes were those most easily and quickly made. In four of the counties the figure "1" was entered before the figures appearing on the returns in his race indicating his vote. Such a figure could be made as easily and as quickly as

a check mark could be placed opposite the figures. Such a change could be made without those actually present discerning it, unless they were particularly on guard against such a change. The returns from one of the counties were changed by converting a "7" into a "9," and that is so easily done that it could have happened unobserved by others present. We are not saying that it was so done, because that is not the province of the court, but we are trying to determine whether there was evidence from which a jury may have reached the conclusion, beyond a reasonable doubt, that appellant did make the changes. The motive existed, the opportunity was present, and the changes were made. That is not all which a jury may consider in connection with whether appellant was the guilty perpetrator of the offense. Every change which was made purported to increase the vote which he had received.

We not only have motive, opportunity, but we have the further fact that the result was beneficial to appellant. Leaving out of consideration the established fact that appellant was in the private office of the chairman of the board of election commissioners on Monday morning when the returns were there, there was enough evidence to authorize the submission of the cases to the jury. There is no charge of conspiracy in the indictments, and all of the parties testified that appellant did not see the returns from these counties while he was in the private office of the clerk of the Court of Appeals. There are many suspicious and unexplained circumstances surrounding everything while he was there, but the positive testimony of the witnesses introduced by the commonwealth was to the effect that he did not make any change in the certificates in that office. The jury, however, is not confined to the oral statement of witnesses while on the witness stand. The jury may consider circumstances which speak more positively than the expressed words of witnesses.

Counsel for appellant assert that the evidence was not sufficient under the authority of Van Winkle v. Commonwealth, 225 Ky. 72, 7 S. W. (2d) 845, on the ground that it was there held that, when the evidence goes no further than to show that there was a mere opportunity on the part of the person charged to commit a forgery it is not sufficient. In that case a letter containing a check had passed through the hands of the defendant,

and the name of the payee had been indorsed on it. There was nothing to show that the person charged there received any benefit from the forgery, or that he had any greater opportunity to commit it than others. The facts in that case distinguish it from these cases. The evidence here does not show that any other person, unless we consider the officials who had custody of the returns, had such an opportunity, or any opportunity, to make the alteration.

It is argued by counsel for appellant that the facts and circumstances shown by the proof do not reasonably exclude every hypothesis of appellant's innocence. It was a question for the jury whether the evidence excluded every reasonable hypothesis of appellant's innocence. It is true that it was held in Marcum v. Com., 212 Ky. 212, 278 S. W. 611, that, when the circumstances proved, upon the trial of a case to establish the commission of a crime, are as consistent with defendant's innocence as with his guilt, they are insufficient to reasonably exclude every hypothesis of the innocence of the defendant. These cases do not fall within that rule. Of course, it may be that appellant is not guilty of the offenses charged, and it may be that others committed these crimes for him and without his knowledge or consent, but the evidence does not point to any other person so that this court can say, as a matter of law, that the facts and circumstances are calculated to raise a presumption of his innocence as easily as it might be said that they raise a presumption of his guilt. The question was for the jury. An examination of the cases of Denton v. Com., 188 Ky. 30, 221 S. W. 202; Mullins v. Com., 196 Ky. 687, 245 S. W. 285; Jones v. Com., 217 Ky. 427, 289 S. W. 676; Johnson v. Com., 217 Ky. 705, 290 S. W. 693; Mitchell et al. v. Com., 217 Ky. 155, 289 S. W. 208; Chambers v. Com., 200 Ky. 295, 254 S. W. 906, discloses that a state of facts in each case was presented to the jury differing from the state of facts presented in the cases under consideration.

It was held in the case of Woolum v. Com., 220 Ky. 836, 295 S. W. 1029, that suspicious circumstances do not constitute proof of guilt beyond a reasonable doubt. Such is the general rule, but there is much more in this case than mere suspicious circumstances.

We leave the question of evidence sufficient to support the charge with the statement that, if the evidence complained of as incompetent had been excluded, we would be unable to hold that the court erred in overruling the motion of appellant for a peremptory instruction directing the jury to return a verdict in his behalf.

Taking up the points urged against the instructions given by the court, we will first lay to one side the third instruction relating to the purposes for which the evidence as to the crime committed in Rockcastle county was admitted. An instruction was given covering each case, and in substance, they are the same. The instruction in one of the cases is as follows:

"If the jury believe from the evidence beyond a reasonable doubt that in Franklin County, Kentucky, and before the finding of the indictment herein, the defendant, James A. Wallace, did unlawfully, willfully and feloniously alter the certification of returns of the Republican primary election from Fulton County, by changing said returns in the race for Auditor of Public Accounts, by placing the figure '1' before the figures '30' in said certification of returns so that the vote for defendant appeared as 130, said return being originally 30, then you should find the defendant guilty as charged in the indictment and fix his punishment at confinement in the State Reformatory for not less than 1 year nor more than 5 years."

No complaint appears to be made about that instruction, and, indeed, none could be reasonably made. The issue was clearly submitted to the jury. Did appellant unlawfully, willfully, and feloniously alter the certificate of the Fulton county election returns by placing the figure "1" before the figures "30"? That was the exact question before the jury, and that is precisely what the court submitted to the jury. The entire complaint about the instructions made by appellant relates to instruction No. 3, and no complaint is made about the other instructions. In view of the conclusions we have reached, it is unnecessary to discuss instruction No. 3.

Another complaint is made about the conduct of the commonwealth's attorney in his closing argument to the jury. There were slight objections to the closing argument, but we deem it of sufficient importance, without

attempting to lecture the commonwealth attorney, to say, in passing, that his closing speech to the jury was probably more unrestrained than it should have been. It has been often held by this court that the commonwealth's attorney should present to the jury the facts as disclosed by the evidence, and that he may argue to the jury every reasonable deduction which may be made from the facts. It is never proper to admonish a jury that, if it does not convict, the members of the jury violate the oath which they have taken. Vituperation and attacks on the character of the person on trial not specifically justified or authorized by the evidence are not proper. The expression of the personal opinion of the attorney not based solely on the evidence is not permissible. No reference to the station in life, wealth, or poverty of a defendant is in good taste. It is the duty of the commonwealth's attorney to assemble the facts and his inferences in the most formidable array, and in doing so it is not against the rules which have been announced by this court for him to use vigorous language, but he must be careful to deal with the facts and the law and with these only.

It may be that the commonwealth's attorney, in his closing argument, transgressed some of the rules that have been announced by this court which should control under such circumstances, but he had great provocation. He was beginning his term of office, and he was confronted with facts showing that crimes had been committed, and some of the witnesses on whose evidence he was compelled to rely had been reluctant, forgetful, evasive, and uncertain. The crimes that he knew had been committed were revolting in the extreme. His legal brethren on the other side, to whom he was always courteous, and they in turn always courteous to him during the trial, had properly, and as the law allowed them to do, exerted every bit of their knowledge in defense of their client. An examination of the record shows that the commonwealth's attorney was greatly handicapped in getting before the jury the evidence because of objections made to every line of questioning which he pursued. Counsel representing appellant were within their rights in making objections, but it nonetheless sets the teeth of the commonwealth's attorney on edge to labor for days in an effort to get his facts before the jury and find that at every turn he is confronted

by an able and experienced lawyer jealously guarding every road. The court was painstaking and careful and patient in the extreme. At the end of the trial, no doubt the commonwealth's attorney was keyed up to a high pitch of nervousness, and that, we are persuaded, accounts somewhat for the rather extravagant language that he used at times. Since we must reverse the case on the ground we will next take up, we would suggest that on another trial the commonwealth's attorney be more restrained in presenting his case to the jury.

There was no evidence in the record which showed, or tended to show, that appellant was in Rockcastle county after the primary election and before the fraud was attempted in that county. There is no proof that he either directly, or indirectly, induced, or attempted to induce, any person to perpetrate that indefensible crime against the Republican voters in Rockcastle county and the state of Kentucky. There is no evidence, therefore, connecting him with the commission of the crime in Rockcastle county. We dismiss, without consideration, the argument of counsel for appellant that the proof does not show that the certification from Rockcastle county to the secretary of state was valid. Roberson's New Kentucky Criminal Law and Procedure, sec. 794, clearly states the rule relating to the admission of evidence of other crimes. It is there stated that such evidence is admissible, if it tends to establish identity or guilty knowledge, or intent or motive for the commission of the crime under trial, or malice, or when other offenses are so connected or interwoven with the one being tried that they cannot well be separated from it in the introduction of relevant testimony, or when the independent offense was perpetrated to conceal the crime for which the accused is on trial, or committed by novel means or any particular manner, or is a part of a plan or a system of criminal actions.

The evidence as to the crime committed in Rockcastle county would have been competent on more than one of these grounds if it had been established that appellant committed the crime in that county, or was connected with it, or had guilty knowledge of it. It is first necessary, before admitting proof of a crime other than the one for which the offender is on trial, to show that he committed, or was connected with, the other crime. It has been held by this court that evidence of other

crimes is admissible when such crimes and the one charged constitute a general plan, scheme, or system. Brashear v. Com., 178 Ky. 492, 199 S. W. 21; Clary v. Com., 163 Ky. 48, 173 S. W. 171; Morse v. Com., 129 Ky. 294, 111 S. W. 714, 33 Ky. Law Rep. 831. All of the authorities cited by the Attorney General in his brief tend to support the conclusion which he contends is the correct conclusion relating to the admission of such evidence, but nowhere does the Attorney General attempt to justify the admission of evidence of other crimes without proving that the defendant on trial committed the other crimes In the case of Morse v. Com., supra, this court, in dealing with the question of the admission of evidence relating to other crimes, said:

> "But it is not often that it is permissible, in order to show intent to introduce evidence of other and distinct crimes; and it may be said to be a rule of general application in the trial of criminal cases that the Commonwealth will not be permitted to introduce evidence showing that the accused has committed other and distinct crimes than the one for which he is being tried. The justice of this rule cannot be denied. Evidence of the commission of other offenses is very prejudicial to the accused, has a tendency to divert the mind of the jury from the case under consideration, and often may find the accused entirely unprepared to meet the new issues presented."

A late case dealing with the admission of evidence of other crimes is that of Eagle v. Com., 223 Ky. 178, 3 S. W. (2d) 212, where many authorities are cited which announce the general rule in this state governing the admission of that character of evidence. Measured by these rules, the evidence of the distinct crime, or crimes, committed in Rockcastle county, was not admissible, because there was no proof connecting the appellant with such crime. The evidence should have been excluded.

The appellant himself brought into the proof the certificate which he received through the mails on Sunday which evidenced the final culmination of the Rockcastle county scheme. But the mere possession of the certificate explained by the appellant without contradiction was not sufficient to render the evidence as to the crimes in Rockcastle county competent.

The minutes of the state board of election commissioners showing the findings of that board were not competent and should not have been admitted. They were no more than the statements of the opinion of the individual members of the board, and at that about a matter where the board had no right to speak.

Since the evidence relating to the crimes in Rockcastle county should not have been admitted, Instruction No. 3 should not have been given.

We cannot close this opinion without commending the officers of the commonwealth in their effort to go to the bottom of this attack on the very basis of free government. Such crimes should not go unpunished. Every person is guaranteed a fair trial under the Constitution and laws of this commonwealth, and, regardless of his station in life, he must have a trial free from prejudicial errors. Such a trial the appellant should have, and a jury of his countrymen should determine whether, with all of his past honors, his successful life, and his reputed high standing, he fell so low in the scale of humanity as to perpetrate the crimes with which he is charged.

Judgment reversed, and cause remanded for proceedings consistent with this opinion.

Whole court sitting.