# Carter v. Commonwealth.

April 25, 1939.

WHITE & CLARK for appellant.

HUBERT MEREDITH, Attorney General, and W. OWEN KEL-LER, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY CREAL, COMMISSIONER—Affirming.

Martin Carter, Sr., a negro nearly seventy years of age, has been found guilty of manslaughter under an indictment charging him with the murder of his son, A. L. Carter, and his punishment fixed at confinement in the penitentiary for ten years.

By this appeal he is seeking a reversal of the judgment on the following grounds (1) that the verdict of the jury is flagrantly and palpably against the evidence; (2) misconduct of the attorney for the Commonwealth while appellant was testifying; (3) misconduct of the sheriff and a deputy during the progress of the trial; (4) improper and prejudicial statements made by the Commonwealth's attorney in his closing argument before the jury.

As shown by the evidence Martin Carter owned a farm in Christian county on which he and his wife resided. Josephine Carter, a daughter of deceased, and an afflicted grandson lived with them. It is stated in the briefs for both appellant and the Commonwealth that deceased and Eddie Carter, another son, spent their "vacations" from the Eddyville penitentiary on the farm of their father but at such times occupied a cabin apart from the main residence.

Shortly before Christmas of 1937, deceased on being released from the penitentiary went to the home of his father, and he and his brother, as appears, were to work for or assist their father in the farm operations. The homicide occurred at the home of appellant on or about February 28, 1938. According to the evidence of appellant he asked his sons, deceased and Eddie Carter, to cut some wood, which they refused to do, saying that they were going to work for one Moss. He reminded them that it was time to begin farm work and that they had been doing nothing; that if they did not propose to work for him they would have to get out and leave. Eddie owed his father something over $3, and after the boys left, appellant took deceased's clothes

out of the cabin but locked it with Eddie's clothes therein with a purpose to hold them until Eddie paid him. He took deceased's clothes to the house and gave them to his wife to be delivered to deceased. When deceased and Eddie returned that afternoon a controversy arose over appellant having Eddie's clothes locked up, and according to the evidence of appellant and other members of the household, both deceased and Eddie were in an angry mood and their language and actions were threatening. Appellant stated that at that time deceased threatened to kill him; that during this controversy deceased got an iron poker and started toward the cabin to break open the door; that Eddie made a motion as if to get appellant's shotgun from the rack, but appellant beat him to the gun and followed A. L. Carter telling him not to break into the cabin; that deceased shot at him once or twice with a pistol and that he then shot into the air in order to frighten deceased; that deceased and Eddie finally left and appellant and other members of the household went into the house, locked the windows and doors and drew all the blinds; that he heard deceased and Eddie talking in the yard two or three times that night and on raising a blind one time saw them, but it appears that they left about midnight or a little later and slept in the hayloft in their father's barn. The next morning, they went to Hopkinsville to talk with the county judge and other officers about their father locking up their clothes although deceased knew that his clothes were not locked up. The officers advised them to have no trouble with their father but to take whatever legal steps might be necessary to secure their belongings. They started back toward their father's home but Eddie stopped at the home of a neighbor.

Tom Brown, a negro, who had been employed to cut some wood for appellant, went there in the morning before deceased returned from Hopkinsville. He stated that he found the family locked in the house with the blinds drawn and he had some difficulty getting in; that they were still locked in when deceased returned about 4 o'clock in the afternoon. Appellant testified that he raised a blind slightly and saw deceased come hurriedly from toward the barn seemingly in a very angry state of mind; that he came upon the front porch and wrenched the doorknob but on being unable to enter peeped in under the lower edge of the blind and then

started hurriedly around the house; that deceased was left handed and had his left hand in his pocket; when deceased started around the house he thought he was going to shoot into the house and in order to protect other members of his family he got his shotgun which had one shell in it, took the only other shell he had and went out the kitchen door; that when deceased came around the house and saw him he attempted to draw his pistol but it seemingly caught in his pocket; that he then fired his shotgun, the shot taking effect in deceased's leg; that he fired another shot which missed deceased and as the latter was still trying to get his pistol out he called to his grandson, a mute, to bring his pistol and when he got it fired one shot at deceased and the latter then turned and walked away going out by the barn and to a field some distance away where he laid down or fell and where he was later found dead.

After the controversy over the clothing the afternoon before the homicide appellant sent his granddaughter to the nearby store or postoffice to have the postmaster or storekeeper call the sheriff to come and arrest deceased for fear he would do appellant and the family harm but for some reason the officers did not come that evening. Appellant testified that on other occasions shortly before the homicide deceased threatened to kill him. He was corroborated in practically every detail by members of his family. A great number of neighbors, both white and colored, testified to the good character of appellant for peace, quietude, good citizenship, etc., and there is no evidence to the contrary. A number of them and a guard from the Eddyville penitentiary where deceased had been confined testified in effect that the latter bore the reputation of being a violent, dangerous, and vindictive man. The coroner and other officers who examined the remains of deceased testified that both shots from the shotgun took effect, one tearing away a portion of the calf of one leg and the other striking parts of the legs; that the pistol shot entered the back about the fourth rib directly under the left shoulder blade; and the evidence indicates that this was the fatal shot. They also testified that they found a loaded pistol in the left pocket of deceased's overalls or in his pants under the overalls. Tom Brown who was cutting wood for appellant testified that after one or two shots had been fired deceased left going toward the spot where he later died and was followed by appel-

lant who had a gun; that two shots were fired after they left the house; but later he became somewhat confused in his statements and it is apparent as indicated in brief or the record that he is a man of very low mentality. The evidence of a neighboring woman also indicates that some shots were fired at or near where the body of deceased was found. The sheriff, county judge and other officers testified that after appellant called them and gave himself up he stated in effect that after deceased had turned and was leaving the house he fired at him with the pistol; that they followed the tracks of deceased to where the body was found, and they also found tracks of another man going to and from that point which corresponded with tracks of appellant.

From the foregoing summary it will be seen that the evidence for the Commonwealth and proven circumstances indicate that if deceased purposed to do harm to his father and was in fact attempting to draw his pistol in furtherance of that purpose, he abandoned such purpose and threatened attack and was retreating from the scene when the fatal shot was fired. On the other hand the evidence for defendant conduces to show that he believed and had reasonable grounds for believing that he was in danger of death or bodily harm at the hands of deceased and that he fired the shots to avert the danger, real or to him apparent.

In criminal cases the question of the credibility of witnesses and the weight to be given their evidence rests with the jury and they may accept the evidence of one witness or one set of witnesses against that of another. Swanigan v. Commonwealth, 240 Ky. 504, 42 S. W. (2d) 726; Ely v. Commonwealth, 239 Ky. 638, 40 S. W. (2d) 276. A jury is not bound by the positive statements of the accused or witnesses favorable to him where the circumstances speak more positively against him or where there is evidence of other witnesses tending to establish guilt. Wallace v. Commonwealth, 229 Ky. 776, 18 S. W. (2d) 290; Lefler v. Commonwealth, 216 Ky. 176, 287 S. W. 569. As will be seen there is a sharp conflict in evidence but there is ample evidence to afford reasonable ground for finding that appellant was guilty and in such circumstances, it cannot be said that the verdict is flagrantly or palpably against the evidence. Shepherd v. Commonwealth, 236 Ky. 290, 33 S. W. (2d) 4; Fox v. Commonwealth, 248 Ky. 466, 58 S. W. (2d) 608.

While appellant was testifying and relating that he

had sent his granddaughter to have the sheriff called and that Mr. Cates did call him, the attorney for the commonwealth objected to the evidence and said in effect to the court and in the presence of the jury that the defendant had stated something that he did not know and had been telling something he did not know ever since he had been on the witness stand. It is argued that this statement made before the jury was very prejudicial because it said in effect to them that appellant had not been telling the truth. Appellant was in fact testifying about matters of which he had no personal knowledge but of which he had been informed by others and some of his previous statements had been of the same character. A jury of sensible men clearly understood and were not misled or prejudiced by such a statement.

It is further urged that the sheriff and one of his deputies who were sitting near the judge and behind appellant while he was testifying were laughing and sneering at him and when objection was made to their conduct the court overruled the objection and that this conduct upon the part of the officials in the presence of the jury was prejudicial. During the course of the direct examination of appellant we find this notation in the transcript:

"By Judge Clark: 'I object to the actions of the sheriff and the deputy sheriff who are sitting by the court laughing and talking all the time.' By the court: 'Overruled. I have not noticed them laughing or talking.' "

According to the transcript of the evidence this was all that was said about the matter and there was no objection made or exception saved to the ruling of the court; but in the bill of exceptions it is stated in substance that the attention of the presiding judge was called to the actions of the sheriff and his deputy; that the officers advised the court they were not laughing at the witness and the court was of the opinion that the jury had not been prejudiced, but thereupon admonished the officers as to their conduct and told them to remove themselves from the position occupied by them and to cease their laughter; that the defendant thereupon moved the court to discharge the jury and declare a mistrial but the court overruled the motion to which the defendant excepted. In both the transcript and the bill of exceptions it is merely stated that the officers

were laughing. There is no showing that the attention of the jury was attracted to them or that the conduct complained of was of a nature calculated to in any wise prejudice or influence the jury against appellant.

According to the bill of exceptions the county attorney in closing argument said in effect that if the jury acquitted appellant then it would be useless to try a man for any crime in that county; that appellant's good reputation had no bearing on the case and if he was acquitted it would be useless to try a man of good reputation for any crime; that the jury could not release appellant without paying more attention to mob law than to the law and the evidence under which they were sworn to try the case. Objection to this argument was overruled and defendant excepted.

Generally speaking, the attorney for the Commonwealth should only argue the law as given by the court and evidence admitted on the trial and reasonable deductions to be drawn therefrom. Rowe v. Commonwealth, 206 Ky. 803, 268 S. W. 571. However, it has been held that a Commonwealth's attorney is given considerable latitude in argument before the jury and may call attention to and condemn lawlessness and crime in strong terms and has a right to insist that the jury try the case according to the law and the evidence and that not to do so has a tendency to encourage lawlessness. Meredith v. Commonwealth, 148 Ky. 106, 146 S. W. 407; Sturgeon v. Commonwealth, 102 S. W. 812, 31 Ky. Law Rep. 536. In Bryant v. Commonwealth, 231 Ky. 152, 21 S. W. (2d) 231, it was held that advice of the prosecuting attorney to a jury to acquit themselves as they swore they would was not improper. It is quite manifest that the statements of the county attorney complained of were not of an inflammatory nature or calculated to prejudice or poison the minds of the jury.

If any of the matters complained of were in fact error it is at once apparent that they were of a trivial consequence and not prejudicial in their nature and this court is not authorized to reverse a judgment for every error but only when it appears upon a consideration of the record as a whole that the substantial rights of the defendant have been prejudiced thereby. See Criminal Code of Practice, Section 353, and cases cited thereunder.

From a careful consideration of the entire record

we are led unerringly to a conclusion that no error prejudicial to appellant's substantial rights is made to appear therein; however, in closing we may with propriety say that the only province of this court is that of review to determine whether any error prejudicial to appellant's substantial rights has been committed in the court below and not to retry the case for the purpose of determining the guilt or innocence of the accused, or the punishment, if any, that should be inflicted. If it were otherwise we might have determined differently. The fact that after the controversy arose on the afternoon before the homicide appellant called for the assistance of the sheriff and barricaded himself and his family in his home from that time until the following afternoon clearly indicated that he was greatly in fear of deceased and anticipated that the latter would do him harm and that because of this fear he may have been precipitate in his attack or relentless in following it up. The circumstances are such as to arouse sympathy for appellant and lead to the conclusion that possibly the jury was too severe at least in fixing the punishment, but since there is no reversible error found in the record, those matters cannot be considered by this court but address themselves to another department of the government.

Judgment affirmed.