RENDERED: DECEMBER 15, 2022
TO BE PUBLISHED

# Supreme Court of Kentucky

2021-SC-0353-MR

HASAN A. SAXTON                                                      APPELLANT

ON APPEAL FROM GRAVES CIRCUIT COURT
V.              HONORABLE KEVIN D. BISHOP, JUDGE
NO. 20-CR-00178

COMMONWEALTH OF KENTUCKY                                             APPELLEE

**OPINION OF THE COURT BY JUSTICE CONLEY**

**<u>REVERSING IN PART & AFFIRMING IN PART</u>**

This case comes before the Court on appeal as a matter of right[1] by Hasan Saxton, the Appellant, from the judgment and sentence of the Graves Circuit Court. After a jury trial, Saxton was convicted of first-degree strangulation, tampering with physical evidence, second-degree persistent felony offender, criminal mischief, possession of marijuana, and possession of drug paraphernalia. [2] The jury recommended thirty years, but the trial court reduced the sentence and imposed only twenty years.[3]

Saxton now alleges five errors: 1) unauthenticated physical evidence was improperly admitted; 2) insufficient evidence to sustain a conviction for

---

[1] Ky. Const. § 110(2)(b).
[2] Saxton was also charged with first-degree rape but was acquitted. Therefore, we omit the details pertaining to that charge in our recitation of the facts.
[3] KRS 532.080 and 532.110.

tampering with physical evidence; 3) error in failing to direct a verdict on the strangulation charge; 4) error in failing to declare a mistrial; and 5) a due process violation by denying effective cross-examination of the victim. For the following reasons, we reverse the convictions for tampering with physical evidence and strangulation, as well as the concomitant convictions for persistent felony offender based upon them, and the possession of drug paraphernalia conviction. We affirm the conviction for possession of marijuana. Saxton has made no argument regarding his conviction for criminal mischief. We affirm that conviction to the extent it was appealed. *Early v. Commonwealth*, 470 S.W.3d 729, 734 (Ky. 2015) ("[I]t is an appellant's burden to present a complete record and to establish that an error is preserved for our review."). Because of our affirming some convictions, we address the failure to declare a mistrial. We also address the cross-examination argument since it is a novel constitutional issue and has ramifications beyond Saxton's own case.

## I.     Facts

Hasan Saxton and Unique Robinson were engaged to be married. On July 8, 2020, after spending the day together, the couple retired to their home. Robinson did not feel good, so she laid down to sleep. Per Robinson's testimony, Saxton announced he was leaving to purchase weed. When Robinson awoke, Saxton had yet to return so she phoned him. He informed her he would be home shortly but inquired if anyone was at the home with her. She answered no, the call ended, and she went back to sleep.

Robinson then testified she awoke to Saxton screaming at her, demanding to know who had been in the house. He tore the covers off her and stood over her— "breathing hard and mad[,]" his eyes "kinda [sic] crazy"— Robinson answered several times that no one had been in the house. Saxton was recalcitrant. Robinson testified he slapped her, accused her of lying and demanded she have sex with him to prove her fidelity. Robinson refused. Saxton then grabbed her throat with his hand, squeezing, so that, as Robinson testified, she could not scream nor breathe. Saxton then released her, spun her around and locked her neck in his forearm, pinning her to the bed. Once more he squeezed. Robinson testified she feared she would pass out. In desperation, she managed to bite Saxton on his arm, and he released her. Robinson grabbed her phone and dialed 911. When she began reporting the incident to the operator, Saxton left the room, and eventually the home.

Among the responding police officers were Officers Rogers and Copeland of the Mayfield Police Department. Officer Copeland encountered Saxton on a public street not far from his home. He detained Saxton, placed him in the back of his cruiser, and drove to the home to further aid the investigation. After arriving, Officer Copeland went to speak with another officer. He returned and noticed that Saxton was leaning forward in his seat. Saxton stated he was trying to stretch his legs. Officer Copeland did not believe him and removed Saxton to another cruiser. He then performed a search of the backseat and body cam footage shows that, approximately eleven seconds after beginning the search, he found a bag of marijuana under the driver's seat. The video is not

clear, but Officer Copeland testified the bag was only partially under the driver's seat and that his cruiser was designed with a "blocker" under the driver's seat to prevent items from being hidden from sight by the seat. At some point, a black plastic container and a burnt cigar containing marijuana were also allegedly found on Saxton in a search incident to arrest performed by Officer Rogers. Officer Rogers never testified to this, however, and the only definitive proof such a search incident to arrest occurred is a citation report completed by Officer Rogers. Officer Copeland's testimony was only that the plastic container "may have been" found on Saxton in a search incident to arrest, and he only testified to that after reading the citation report to refresh his memory. The report stated, "A search of the patrol vehicle and Saxton's person incident to arrest also revealed a small plastic container with a burnt marijuana cigar inside." The Commonwealth, however, clearly believed the plastic container had been recovered during Officer Copeland's search of the vehicle. After playing Officer Copeland's body cam footage showing that search to attempt to refresh his memory, Officer Copeland still testified that he could not recall finding the plastic container.

At trial, a multitude of incidents occurred which form the basis for Saxton's appeal. We address each in more detail in our analysis below. But generally, the morning trial began, as Saxton and his counsel attempted to walk past the front row of jurors to their table, the Commonwealth's investigator intervened and told them to approach the table by another direction. It seems after a brief back-and-forth between the investigator and

4

defense counsel, Saxton and counsel were able to get to their table as originally planned. During trial, Saxton attempted to cross-examine Robinson as to whether she was ever informed of her rights under Marsy's Law. The trial court prohibited the line of inquiry twice; once during the cross-examination itself and second, after a written motion and arguments in chambers were heard the second morning of trial. Saxton argues this was a denial of his right to effective cross-examination.

Saxton also objected to the introduction of several pieces of evidence; namely, eight DNA swabs and accompanying reports, as well as the plastic container and marijuana cigar. Saxton did stipulate to one swab, taken from his bloody left forearm. The stipulation included that there was an injury on his left forearm, it was bloody and a swab was taken, and transported to the relevant lab for testing. For the other DNA swabs, as well as the plastic container and cigar, Saxton argues a fatal flaw at the inception of the chain of custody—no one testified to collecting the drug evidence from his person or taking the swabs from Saxton and Robinson. Thus, he claims a basic failure to link him to the evidence at the foundation. Because of this, Saxton requests reversal of his convictions for strangulation, tampering with physical evidence, and his two PFO and possession convictions.

The jury convicted Saxton of strangulation and tampering with physical evidence, recommending ten and five years in prison respectively. But finding him guilty of being a persistent felony offender (second degree), the jury enhanced the sentences to twenty and ten years, respectively. The jury then

recommended the sentences be served consecutively for a total of thirty years; with the misdemeanor sentences all being served concurrently with the thirty-year felony sentences. The trial court, however, reduced the sentence to twenty years. Saxton appealed, and we now address the merits.

## II.  Analysis

### A. Marsy's Law and Denial of Effective Cross-Examination

The first issue we address, because novel and most consequential, regards Saxton's allegation that Robinson's testimony was coerced by threats of the Commonwealth to charge Robinson with contempt of court if she did not testify, which, if convicted, would necessarily impact her ability to regain custody of her children.[4] Importantly, Saxton frames this argument as Robinson being forced to testify "under duress[,]" but not that Robinson was forced to testify falsely or not testify at all. At the trial court, Saxton stated he wished to investigate whether Robinson had been informed of her rights under Marsy's Law. Ky. Const. § 26A. The trial court prohibited that line of inquiry. The next morning of trial, after filing a written motion, Saxton argued in chambers

> I should be able to inquire whether or not the victim was given her constitutional rights under Marsy's Law in order to be able to consult with her about whether or not she was consulted as to how she wanted the case to proceed, whether she wanted the charges to go on, whether she wanted to go forward.

---

[4] Robinson had been arrested at some point prior to Saxton's trial. A special prosecutor had been appointed to handle Robinson's case because of the conflict resulting from her being a testifying witness in this case.

6

Saxton then linked this to a larger issue of duress, wherein prior to trial Robinson had expressed her feelings to Saxton that she was being "bullied" by the Commonwealth and forced to testify against him. Trial counsel argued that Robinson, by virtue of Marsy's Law, had a "right to remain silent" in the same manner as Saxton and that is what she wanted to investigate on cross-examination.[5] The trial court denied the motion and again prohibited that line of questioning. Before proceeding with our analysis, we reiterate that a witness's credibility is always relevant. *Myers v. Commonwealth*, 87 S.W.3d 243, 246 (Ky. 2002). But there is no allegation that the Commonwealth coerced Robinson to give *false* testimony, only that she was compelled to testify at all.

We will not analyze this issue under Marsy's Law. That constitutional provision explicitly states, "The accused shall not have standing to assert the rights of a victim." Ky. Const. § 26A. Moreover, it is only "[t]he victim, the victim's attorney or other lawful representative, or the attorney for the Commonwealth upon request of the victim [who] may seek enforcement of the rights enumerated in this section . . . ." *Id.*[6] Finally, "Nothing in this section or any law enacted under this section shall be construed as creating: (1) A basis for vacating a conviction; or (2) A ground for any relief requested by the defendant." *Id.* The plain, indubitable meaning of these three sentences is that an accused defendant has no standing to assert the rights of his victim, and

---

[5] This specific contention was not mentioned in the briefing before this Court, and we will not address it.

[6] It is also worth noting that the jury is not constitutionally empowered to enforce the victim's rights at the defendant's trial either.

7

even if the victim's rights are violated in the course of the criminal justice process, said violation can never afford the basis for vacating a conviction on direct appeal, a basis for collateral attack, or "any relief" whatsoever. We reject the proposition that the defendant has a right to inquire into whether a victim has been apprised of her rights under Marsy's Law or that the defendant may "consult" with the victim about whether those rights were being fulfilled to the victim's satisfaction during cross-examination, or indeed at any point in the criminal justice process.

Saxton's attempt to inquire into whether Robinson was informed of her rights under the guise of witness credibility is nothing more than a subterfuge to get around the explicit prohibitions of our constitution. In all cases, the defendant has no valid interest to inquire into whether a victim has been apprised of her rights under Marsy's Law, or whether those rights are being violated, because first, the constitution prohibits such a power being exercised by the defendant; and second, because there is no relief available to the defendant should a victim's rights prove to be violated in any given case. We cannot be clearer: the defendant has no authority to inquire into Marsy's Law matters and trial courts should not hesitate to squelch such a line of inquiry from the defendant the moment it presents itself.

This does not mean, however, that the issue of whether Robinson's testimony was coerced cannot be analyzed under traditional rules. But because the issue was framed under Marsy's Law at the trial court, this argument is unpreserved, and we review for palpable error. Only if there is a manifest

8

injustice will reversal of the conviction be warranted. RCr.[7] 10.26. "[T]he Sixth Amendment right to confrontation must be analyzed whenever the accused is prohibited from cross-examining a witness about his motive or bias." *Commonwealth v. Armstrong,* 556 S.W.3d 595, 602 (Ky. 2018). The right to cross-examination is not absolute, however, and trial courts have wide latitude to enforce reasonable limitations. *Id.* "To state a violation of the Confrontation Clause, the defendant must show that 'he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness[.]'" *Id.* (quoting *Delaware v. Van Arsdall,* 475 U.S. 673, 680 (1986)).

There was no constitutional violation here because the use of the coercive power of the state via subpoena to compel a witness's presence at a judicial proceeding is uncontroversial. It is in fact a guaranteed right. Ky. Const. § 11. "To ensure that justice is done, it is imperative to the function of courts that compulsory process be available for the production of evidence needed either by the prosecution or by the defense." *United States v. Nixon,* 418 U.S. 683, 709 (1974). Thus, even if Robinson did truly feel pressured or "bullied" into testifying, that is the inherent nature of the subpoena power.[8] Additionally, the line of inquiry Saxton sought to pursue per Marsy's Law was not "otherwise appropriate," but rather constitutionally inappropriate. Nor could it have revealed a "prototypical form of bias" on Robinson's part because

---

[7] Kentucky Rules of Criminal Procedure.
[8] The word subpoena literally means "under penalty."

9

being subpoenaed to testify does not in and of itself reflect on a witness'

credibility. It is a common practice throughout the Commonwealth. This is

especially true given Saxton has not alleged that Robinson was pressured to lie

on the stand. To the extent his argument might encompass a claim the

Commonwealth threatened Robinson with further prosecution, such an

argument is mere speculation and does not support the conclusion a violation

of Saxton's right to confrontation occurred. *Armstrong*, 556 S.W.3d at 603. We

find no error in the trial court prohibiting Saxton from inquiring into

Robinson's rights under Marsy's Law.

### B. Directed Verdict Rulings

Next, Saxton argues there was insufficient evidence to sustain the

tampering with evidence charge and the strangulation charge. Both come as

arguments that the trial court erred in failing to direct a verdict in his favor.

"On appellate review, the test of a directed verdict is, if under the evidence as a

whole, it would be clearly unreasonable for a jury to find guilt, only then the

defendant is entitled to a directed verdict of acquittal." *Commonwealth v.*

*Benham*, 816 S.W.2d 186, 187 (Ky. 1991). At the trial level, considering a

motion for directed verdict,

> the trial court must draw all fair and reasonable inferences from
> the evidence in favor of the Commonwealth. If the evidence is
> sufficient to induce a reasonable juror to believe beyond a
> reasonable doubt that the defendant is guilty, a directed verdict
> should not be given. For the purpose of ruling on the motion, the
> trial court must assume that the evidence for the Commonwealth
> is true, but reserving to the jury questions as to the credibility and
> weight to be given to such testimony.

10

*Id.*

On the tampering with physical evidence issue, Saxton argues our recent case in *Commonwealth v. James*, 586 S.W.3d 717 (Ky. 2019) controls. The Commonwealth argues *Taylor v. Commonwealth*, 987 S.W.2d 302 (Ky. 1998) controls. In accordance with our decision in *Commonwealth v. Bell*, __ S.W.3d __ 2022 WL 12196438 (Ky. 2022), *Taylor* is overruled as incompatible with *James*. We, therefore, agree there was insufficient evidence to sustain a tampering with evidence conviction. "[W]here a defendant merely drops, throws down, or abandons drugs in the vicinity of the defendant and in the presence and view of the police, and the officer can quickly and readily retrieve the evidence, the criminal act of concealment or removal has not taken place." *James*, 586 S.W.3d at 731.

In this case, the bag of marijuana found in the police cruiser was placed there in the presence of Officer Copeland, who observed Saxton's movement in the rear seat to drop the bag; the bag was only partially hidden from view by the driver's seat; and was easily recoverable as it only took approximately eleven seconds for Officer Copeland to find the bag after beginning his search of the vehicle. Additionally, Officer Copeland testified the cruiser had blockers installed below the front row seats specifically to prevent items from being concealed. This constitutes mere abandonment, not concealment, and cannot predicate a charge of tampering with evidence under KRS[9] 524.100(1)(a). As

---

[9] Kentucky Revised Statutes.

such, the conviction of Saxton for tampering with physical evidence and being a persistent felony offender based on that conviction is reversed.

As to the strangulation charge, we first note that Saxton's brief is filled with alleged inconsistencies in Robinson's account of the attack. But inconsistency goes to credibility of a witness, and credibility determinations are the prerogative of the jury. *Ross v. Commonwealth*, 531 S.W.3d 471, 476 (Ky. 2017). The jury believed her testimony that Saxton did strangle her by grabbing her throat with his hand and by placing her in a headlock with his forearm to her throat. In the first instance she testified she could not breathe or struggled to breathe, and the second instance she testified she thought she would pass out.

Strangulation in the first degree occurs when the defendant, without consent, "intentionally impedes the normal breathing or circulation of the blood of another person by: (a) Applying pressure on the throat or neck of the other person. . ." or by blocking the nose or mouth. KRS 508.170(1)(a). "Impede" is defined as "to interfere with the progress of." *Webster's New Dictionary of the English Language* 259 (2001). It is more traditionally defined as "to hinder" or "to obstruct." Samuel Johnson, *A Dictionary of the English Language* 374 (Barnes & Noble Books 1994) (1756). Saxton's testimony that she could not breathe and that she felt she would pass out as a result of Saxton squeezing her neck with his hand and forearm easily satisfies the elements required by law thus, we find no error in the trial court's refusal to grant a directed verdict as a matter of law. Moreover, the trial court was required to take Robinson's

12

account as true. Therefore, under the evidence as a whole, it was not clearly unreasonable for the jury to find guilt.

## C. Physical Evidence under KRE 901(a)

Saxton argues unauthenticated evidence was improperly admitted against him, specifically a black plastic container and burnt cigar with marijuana, as well as eight DNA swabs and their test results. Evidentiary questions are addressed for an abuse of discretion. *Ross v. Commonwealth*, 455 S.W.3d 899, 912 (Ky. 2015). "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." KRE[10] 901(a). The proponent of the evidence must demonstrate the evidence at trial was the same as that involved during the events in question and that it has not been materially changed. *Ross*, 455 S.W.3d at 912. For drugs and drug paraphernalia—items which are fungible and not readily identifiable or distinguishable—a stronger foundational showing is required than for non-fungible or readily identifiable evidence, but a perfect chain of custody is not required. *Id.* "Instead, the proponent need only show that 'the reasonable probability is that the evidence has not been altered in any material respect.'" *Id.* (quoting *United States v. Cardenas,* 864 F.2d 1528, 1532 (10th Cir. 1989)). Nonetheless, "[a] complete chain of custody of this evidence tracing its possession from the time it was obtained from the defendant to its final

---

[10] Kentucky Rules of Evidence.

custodian must be established or the samples may not be admitted." *Harrod v. Commonwealth*, 552 S.W.2d 682, 684 (Ky. 1977). "For purposes of authentication, the condition of fact which must be fulfilled by every offer of real proof is whether the evidence is what its proponent claims." *Hunt v. Commonwealth*, 304 S.W.3d 15, 39 (Ky. 2009).

###     i.        The Plastic Container and Marijuana Cigar

We agree the Commonwealth's failure to have Officer Rogers testify that he did in fact find the black container and marijuana cigar on Saxton's person is fatal to establishing a sufficient chain of custody. The Commonwealth has failed to establish the necessary link between the real evidence offered and Saxton at the foundation. Officer Copeland's testimony was only that the plastic container "may have been" found on Saxton in a search incident to arrest, and he only testified to that after reading a citation report to refresh his memory that was completed by Officer Rogers. Since Officer Copeland's testimony was qualified—"may have been"—it was in fact the citation report which ended up being the only definitive "evidence" of how the plastic container was found. Of course,

> For the purpose of refreshing his recollection the party doing the examining (whether direct or cross) may show to the witness a pre-trial statement, but may not for that purpose introduce it in evidence or *read it to the jury*. The statement cannot be read under the pretext of refreshing the recollection of the witness.

*Payne v. Zapp*, 431 S.W.2d 890, 892 (Ky. 1968) (Emphasis added). That is precisely what the Commonwealth had Officer Copeland do here—read the citation report to the jury, ostensibly to refresh his memory, but said memory

14

was never refreshed. We must again note the Commonwealth originally believed the plastic container was recovered by Officer Copeland in the police cruiser. The testimony elicited that it may have been found in a search incident to arrest was apparently a last resort, and perhaps explains why the Commonwealth did not have Officer Rogers testify to whether he recovered the plastic container and marijuana cigarette. But if true, that only underscores our conclusion the Commonwealth has failed to sufficiently link the real evidence to Saxton. The Commonwealth itself apparently does not know who discovered the plastic container and cigar, when they were discovered, or how. Because the Commonwealth failed to definitively link the real evidence with Saxton by failing to have any police officer simply testify to recovering the evidence from his person, we reverse the conviction for possession of drug paraphernalia and the $100 fine.

As to the marijuana cigar, the issue is a red herring. Although allegedly found inside the plastic container, it supported the possession of marijuana charge. If it had been the only drug allegedly found in Saxton's possession, then reversal of the possession conviction would be required. But Saxton fails to account for the fact that the bag of marijuana he abandoned in the police cruiser also supports that possession charge as well.

> No error in . . . the admission or the exclusion of evidence . . . is ground for granting a new trial or for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order unless it appears to the court that the denial of such relief would be inconsistent with substantial justice.

15

RCr. 9.24. "A reviewing court should ask 'whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand.'" *Brown v. Commonwealth*, 553 S.W.3d 826, 836 (Ky. 2018). We do not have a "grave doubt" that admitting the cigar into evidence had a substantial influence on the jury in light of the evidence that Saxton possessed a bag of marijuana, which he abandoned in the police cruiser. Although we have reversed his tampering with evidence conviction, that does not mean the bag of marijuana as an evidentiary matter cannot support a possession charge, a result similarly reached in *Commonwealth v. James*, 586 S.W.3d 717, 721-24 (Ky. 2019). The jury instruction—and Saxton has not made any argument regarding any jury instructions—stated in pertinent part,

> You will find the Defendant guilty of Possession of Marijuana under this instruction if, and only if, you believe from the evidence beyond a reasonable doubt all of the following:
>
> 1. That in this county on or about July 8th, 2020 and within 12 months before the finding of the Indictment herein, he had in his possession a quantity of marijuana;
>
> AND
>
> 2. That he knew the substance so possessed by him was marijuana.

The facts adduced at trial were that a bag of marijuana was recovered in the police cruiser after Saxton had been detained inside it. Officer Copeland testified that the bag was not present in the cruiser prior to his detaining Saxton as he routinely searched his vehicle after a person had been inside it to search for items or contraband. Moreover, Saxton must have possessed the bag

16

at one point in order for him to abandon it. Finally, Robinson's testimony that Saxton had told her he was leaving the house to go get marijuana, all support the possession conviction.

Saxton has argued that the "green leafy substance" found in the bag was never chemically tested to prove it was marijuana. But we rejected that argument in *Jones v. Commonwealth*, 331 S.W.3d 249, 252 (Ky. 2011), noting that virtually every court, state and federal, throughout the Union had similarly rejected chemical testing as an absolute prerequisite for conviction of a drug-related offense. *Id.* at 253. Here, Officer Copeland testified to his belief that the bag contained marijuana. His testimony was sufficient compared to the previous case where we sustained a conviction for a drug-related offense on the testimony of a known drug user identifying the substance by eyesight, despite a State Trooper contrarily testifying that laboratory analysis was necessary to identify the substance. *Miller v. Commonwealth*, 512 S.W.2d 941, 943 (Ky. 1974).

### ii.    The DNA Swabs – Left Forearm and Two Buccal Standards

As to the DNA swabs, Saxton's hands and arms were swabbed, and control swabs for Saxton and Robinson each were taken, as well as buccal swabs for each. We decline to review the swabs of Saxton's hands. These went to the rape charge. Since the jury acquitted him on that charge, any error was harmless. *Butler v. Commonwealth*, 516 S.W.2d 326, 328 (Ky. 1974). For similar reasons, we decline to review the swabs for the right arm or control swabs. The latter were not even tested so it cannot be said they improperly

17

influenced the jury. The right arm, though tested, had no relevance to the attack since it was consistently maintained by the Commonwealth that Saxton's left arm had choked Robinson and was bitten by her. The Commonwealth concedes in its briefing the right arm swab's relevance to any specific charge is unclear. But being irrelevant, we conclude its erroneous admittance was harmless and did not substantially sway the result. *Davis v. Commonwealth*, 620 S.W.3d 16, 31 (Ky. 2021).

As for the three remaining DNA swabs and test reports (the left arm swab of Saxton and the two buccal swabs), it must first be noted that Saxton stipulated at trial that his left forearm had an injury and there was blood, that a swab was taken of the blood, and the swab was sent to the state lab.[11] This stipulation obviates any perceived deficiencies of the Commonwealth either in not having a person testify when and where he or she collected the swab or as to the chain of custody from collection to deliverance of the swab to the lab. Saxton cannot stipulate that the swab was taken and sent to the lab, then complain the chain of custody is incomplete due to lack of testimony about how the swab was originally taken and sent to the lab.[12] *Stone Coal Corp. v.*

---

[11] The trial court erroneously told the jury the swab was delivered to the lab on July 9, 2020. The report states the Western lab received it on August 3, 2020. In any event, the discrepancy in the date goes to weight and credibility. It does not negate the substantive agreement reached by the parties pertaining to the existence of an injury on Saxton's left arm, that the left arm was bloody, and a swab was taken of that blood and delivered to the lab.

[12] At this point it is also worth noting that officer body cam footage does exist, as the Commonwealth represented, showing the injury and the swab of Saxton being taken. It was to prevent this video being played in court that Saxton stipulated to the collection of the swab.

*Varney*, 336 S.W.2d 41, 42 (Ky. 1960) (finding stipulation that deposition could be read into record precluded review of alleged error in allowing the deposition to be read into record).

The problem to be resolved upon review is no one testified to collecting the two buccal swabs of Saxton and Robinson, and these swabs were not covered by the stipulation. Although the Commonwealth may have argued the Saxton buccal swab was taken at the same time as the left forearm swab, the stipulation read by the court to the jury did not encompass such a fact. The stipulation clearly pertained only to the left forearm. But absent the two buccal swabs, which were tested, there is no basis to establish the DNA found on Saxton's left forearm belongs to Saxton and Robinson.

Lyle Hall, the DNA analyst for the Kentucky State Police Crime Lab in Frankfort, testified, "a buccal standard is where they swab the inside of your cheek to get a DNA profile, so we know it came from that person. It would have to be a blood standard or buccal standard." Hall also testified the buccal swab was a key part of determining the occurrence of a particular DNA profile in the general population as it serves to rule out any possibility of extraneous DNA in any given sample. In other words, Hall analyzed the left forearm sample and concluded two people had contributed to the DNA mixture and comparing it to the two buccal standards was able to determine that Saxton and Robinson were those two contributors. He then concluded that, based on relevant United States populations, he would expect to see the same DNA profile once in 16 sextillion tests.

19

We have previously cited our harmless error rule in RCr 9.24, and, reviewing a non-constitutional claim, we will deem an error in the admittance of evidence harmless "if we can say with fair assurance that the judgment was not substantially swayed by the error." *Brown v. Commonwealth*, 313 S.W.3d 577, 595 (Ky. 2010). "Our inquiry is not simply 'whether there was enough evidence to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand.'" *Id.* (quoting *Kotteakos v. United States*, 328 U.S. 750, 765 (1946).

The error below occurred when the trial court admitted the buccal standards without any foundational testimony from any person that he or she collected the buccal standards from Saxton and Robinson. Although we do not require a perfect chain of custody, that rule does not apply when the foundational link in the chain is lacking. Here, there was no testimony the DNA swabs meant to establish that the DNA found on Saxton's left forearm belonged to him and Robinson were in fact taken from Saxton and Robinson prior to being tested. This is a lack of foundation, pure and simple. Nor can we say this error was harmless. Robinson testified to Saxton choking her and biting him to escape. The improper DNA evidence substantiated her testimony. We have no way of knowing how much the jury relied upon this improper evidence nor whether without it they would have believed Robinson at all.

The Commonwealth has pointed to police body camera footage showing Robinson with a hoarse voice as additional physical evidence confirming the

20

attack, but that is unpersuasive. Hoarseness of voice can be explained by the two having an argument beforehand, which would be consistent with Robinson's own testimony. Thus, we have serious concerns the erroneous admission of the buccal swabs substantially influenced the jury in determining guilt on the strangulation charge. Consequently, we must reverse the strangulation conviction as well as the PFO II conviction concomitant with it.

### D. No Error in Failing to Declare Mistrial

Finally, there is Saxton's argument that the trial court erred for failing to grant a mistrial due to the Commonwealth's investigator confronting defense counsel prior to voir dire in the presence of the venire. The investigator presumptuously took it upon himself to prevent counsel from walking past the first row of jurors and informed her she and Saxton had to get to their table by another route. From Saxton's arguments in chambers though, it seems he and counsel walked to the table by their chosen route despite the interference. The Commonwealth argued to the trial court that the confrontation was minor and being dramatized by the defense. The Commonwealth told the court there were no raised voices, and that they would not have even known the incident occurred but for it happening in their line of sight. Saxton argues this confrontation created an inherently prejudicial environment, calling for a mistrial citing *Holbrook v. Flynn*, 475 U.S. 560 (1986), but notably defense counsel never sought to voir dire the jurors on this incident.

Recently, in *Deal v. Commonwealth*, 607 S.W.3d 652, 663-65 (Ky. 2020), we undertook to explain the *Holbrook* standard. But neither *Deal*, nor the

21

Supreme Court of the United States cases it relied upon are apposite here. *Deal* addressed the issue of a video being shown of the defendant in custody and wearing jail attire, an inherently prejudicial circumstance. *Id.* at 667. And all the cases it relied upon for this holding dealt with routine, repetitive, customary, and prolonged practices as opposed to single incidents beyond the direction of the trial court. *Holbrook, supra,* at 570-71 (four additional uniformed officers in first row during trial not inherently prejudicial); *Deck v. Missouri,* 544 U.S. 622, 626 (2005) (routine use of visible shackles during guilt phase unconstitutional); *Estelle v. Williams,* 425 U.S. 501, 512-13 (1976) (state cannot compel a defendant over his objection to wear prison attire at trial). In contrast, the complained of event below was a Commonwealth's investigator interrupting the progress of Saxton and his counsel to their table for only a few moments. The Commonwealth's cases in support of its argument are not helpful in analyzing this issue either, as they deal with spectators wearing t-shirts displaying sympathetic messages for the victim. *Hammond v. Commonwealth,* 504 S.W.3d 44 (Ky. 2016); *Allen v. Commonwealth,* 286 S.W.3d 221 (Ky. 2009).

The facts presented by this case are more analogous to an outburst and ought to be addressed under the well-established standards regarding outbursts. "A mistrial is an extreme remedy and should be reserved for the rare occasions in which is it manifestly necessary to protect fundamental fairness and the rights of the parties involved." *Commonwealth v. Padgett,* 563 S.W.3d 639, 651 (Ky. 2018). Moreover, we have found in the context of emotional

22

outbursts of a victim's family members, that an admonition is "more than sufficient to cure any possible prejudice" resulting from such outbursts. *Coulthard v. Commonwealth*, 230 S.W.3d 572, 577 (Ky. 2007). In *Boyd v. Commonwealth*, a juror committed an outburst during voir dire by suggesting hanging should be brought back, which elicited the laughter of several other jurors in the court room. 439 S.W.3d 126, 130 (Ky. 2014). We upheld the trial court's refusal to dismiss the venire, reasoning the trial court had properly admonished the venire and there was no demonstration of actual prejudice. *Id.* In *Carter v. Commonwealth*, the previous Court of Appeals upheld a trial court's refusal to grant a mistrial based upon the conduct of a sheriff and his deputy, who were seated behind the defendant whilst he was testifying and laughing and sneering at him. 128 S.W.2d 214, 217-18 (Ky. 1939). It concluded "[t]here is no showing that the attention of the jury was attracted to them or that the conduct complained of was of a nature calculated to in any wise prejudice or influence the jury against appellant." *Id.* at 218. In other words, no prejudice was intended by the officers nor demonstrated by the defendant. It is noteworthy, however, that the defendant related the trial court had admonished the two officers and ordered them to sit in another area. *Id.*

"[W]here an admonishment is sufficient to cure an error and the defendant fails to ask for the admonishment, we will not review the error." *Coulthard, supra,* at 578 (quoting *Lanham v. Commonwealth,* 171 S.W.3d 14, 28-29 (Ky. 2005)). The cases above demonstrate that admonishment is an adequate remedy when dealing with an outburst. Here, the Commonwealth

conceded an admonishment might be appropriate, but Saxton did not agree and instead sought a mistrial. Moreover, he has not shown actual prejudice despite having the opportunity to do so during voir dire. Like in *Carter*, no showing has been made that the Commonwealth investigator's action was meant to prejudice the venire or that the venire even noticed the incident. Therefore, no basis exists to hold the venire was prejudiced to such a degree as to make the subsequent trial inherently prejudicial. The court did not err in refusing to declare a mistrial.

### III.    CONCLUSION

For the aforementioned reasons, we reverse the tampering with evidence conviction, the strangulation conviction, the PFO II convictions based upon them, and the possession of drug paraphernalia conviction. We affirm the possession of marijuana conviction. We remand to the trial court for further proceedings consistent with this judgment.

All sitting. Minton, C.J.; Hughes, and Keller, JJ., concur. VanMeter, J., concurs in part and dissents in part by separate opinion in which Nickell and Lambert, JJ., join.

VANMETER, J., CONCURRING IN PART AND DISSENTING IN PART: While I concur in much of the majority's well-considered opinion, I respectfully dissent from the reversal of the strangulation conviction and its resulting PFO conviction. Under RCr 9.24, we disregard errors in the admission or exclusion of evidence unless denial of relief is inconsistent with substantial justice. While the Commonwealth's chain of custody on the buccal swabs may have

24

been insufficient, my view is that Robinson's testimony, including her biting Saxton's left arm, together with the admitted bloody injury to his arm were sufficient corroboration of the facts for which Saxton was convicted.

Nickell and Lambert, JJ., join.

COUNSEL FOR APPELLANT:

Erin Hoffman Young
Sarah D. Dailey
Assistant Public Advocate


COUNSEL FOR APPELLEE:

Daniel Cameron
Attorney General of Kentucky

Jenny Lynn Sanders
Assistant Attorney General